702 F.2d 788
 13 Envtl. L. Rep. 20,534
 Frank E. MIDKIFF, Richard Lyman, Jr., Hung Wo Ching, Matsuo
Takabuki and Myron B. Thompson, Trustees of the
Kamehameha Schools/Bishop Estate,
Plaintiffs- Appellants,
v.
Paul A. TOM, Tony Taniguchi, Wilbert K. Eguchi, Wayne T.
Takahashi, Lawrence N.C. Ing, Nobuyoshi Tamura, Andrew I.T.
Chang, and David C. Slipher, Commissioners of the Hawaii
Housing Authority; Franklin Y.K. Sunn, Executive Director
of the Hawaii Housing Authority; and Hawaii Housing
Authority, Defendants-Appellees,
and
Wai-Kahala Tract "H" Association, Inc.; Halawa Hills
Landsale Committee; Awakea Association; Alii Shores
Community Association; Enchanted Hills, Unit I; Portlock
Community Association (Maunalua Beach); Kokohead Community
Lease- Fee, Inc.; West Marina Community Association;
Kalama Valley Community Association; Maunalua Triangle-Koko
Kai Community Association, Inc.; Hahahione Valley Community
Association, Inc.; Kamiloiki Community Association;
Lunalilo Marina Community Association; Mariners Ridge and
Cove Fee/Lease Conversion Committee; Spinnaker Isle
Association; Waialae Iki Community Association; Waiau
Community Association; Kahala Community Association, Inc.;
Kahala Community Fee Purchase Fund and Halawa Valley Estates
Fee Conversion Corporation, Intervenors-Appellees.
 No. 80-4368.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 21, 1981.
Decided March 28, 1983.
 
 Clinton R. Ashford, Honolulu, Hawaii, for plaintiffs-appellants.
 Yukio Naito, Shim, Sigal, Tam & Naito, A. Bernard Bays, William E. Atwater, Dennis E.W. O'Connor, John A. Roney, Stubenberg, Roney, Hartnett, Lawhn, Fong & Kuwaski, Tany S. Hong, Atty. Gen., Honolulu, Hawaii, for defendants-appellees.
 Appeal from the United States District Court for the District of Hawaii.
 Before ALARCON, POOLE and FERGUSON, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 The question presented by this case is whether a state may take real property from a lessor and transfer title in fee simple absolute to a lessee because of a shortage of land for fee simple residential ownership.[1] We hold that such a taking violates the federal constitution.I
 
 
 2
 On February 19, 1979, the Trustees of the Kamehameha Schools/Bishop Estate [Bishop Estate] filed a declaratory relief action alleging that the Hawaii Land Reform Act, Hawaii Rev.Stat. ch. 516, was unconstitutional. The Commissioners and the Executive Director of the Hawaii Housing Authority and the Hawaii Housing Authority were named as defendants [original defendants and intervenors hereinafter Appellees]. The district court declared that the challenged statute before us was constitutional. Midkiff v. Tom, 483 F.Supp. 62, 70 (D.Haw.1979). This appeal followed.
 
 
 3
 The Hawaii Land Reform Act permits certain lessees in possession of land in that state to acquire title in fee simple absolute through eminent domain proceedings. This legislation was enacted after a determination by the Hawaii Legislature that land ownership is concentrated in a few persons who have chosen to lease their property rather than to sell it. The legislature found that this practice has resulted in a shortage of fee simple land and an artificial inflation of residential land values in the state.
 
 
 4
 We must decide whether the Federal Constitution permits a state to take the private property of A and transfer its ownership to B for his private use and benefit. It is our view that it was the intention of the framers of the Constitution and the fifth amendment that this form of majoritarian tyranny should not occur. The protection provided by the fifth amendment has been extended to the states by reason of the fourteenth amendment. Missouri Pacific Railway v. Nebraska, 164 U.S. 403, 417, 17 S.Ct. 130, 135, 41 L.Ed. 489 (1896); Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 158, 17 S.Ct. 56, 63, 41 L.Ed. 369 (1896).
 
 II
 
 5
 As originally drafted, the Federal Constitution contained no reference to the protection of private property interests. It is quite clear, however, that prior to the founding of this nation, it was well established that the government could not take private property except for the use of the public. Hugo Grotius, one of the first commentators to define eminent domain, articulated a "public advantage" as a necessary prerequisite to a taking by the state. 2 H. Grotius, De Jure Belli Ac Pacis 385 (F. Kelly trans. London 1925) (1st ed. Amsterdam 1646). In 1758, E. de Vattel wrote that the exercise of the power of eminent domain had to be for the "public welfare." E. de Vattel, The Law of Nations, 96 (C. Fenwick trans. 1916) (1st ed. 1758). S. Pufendorf stated that a government taking must be for the "necessities of the state." De Jure Naturae et Gentium 1285 (C. & W. Oldfather trans. London 1934) (1st ed. 1688).
 
 III
 
 6
 The failure to spell out a precise guarantee for the protection of life, liberty, and property interests in the body of the United States Constitution was deliberate. James Madison, considered by historians to be the Father of the Constitution,[2] explained the reasons for this conscious omission as follows:
 
 
 7
 My own opinion has always been in favor of a bill of rights .... At the same time I have never thought the omission a material defect, nor been anxious to supply it even by subsequent amendment, for any other reason than that it is anxiously desired by others.... I have not viewed it in an important light--1. because ... the rights in question are reserved by the manner in which the federal powers are granted. 2. because there is great reason to fear that a positive declaration of some of the most essential rights could not be obtained in the requisite latitude.... 3. because the limited powers of the federal Government and the jealousy of the subordinate Governments, afford a security which has not existed in the case of the State Governments, and exists in no other. 4. because experience proves the inefficacy of a bill of rights on those occasions when its controul is most needed....
 
 
 8
 Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), reprinted in 5 The Writings of James Madison 271-72 (G. Hunt ed. 1904).
 
 
 9
 Madison was, however, keenly mindful of the need to create a form of government which would protect each person's property interests. He stated this concern eloquently at the constitutional convention. "In future times a great majority of the people will not only be without landed, but any other sort of, property. These [may] ... combine under the influence of their common situation; in which case, the rights of property & the public liberty, [will not be secure in their hands] ...." 2 The Records of the Federal Convention of 1787 203-04 (M. Farrand ed. 1911) (footnotes omitted).[3]
 
 
 10
 In 1787 Madison expressed his views to Thomas Jefferson concerning the need to protect minority rights from the acts of a majority that might seek to remedy unequal property distribution through legislative action:
 
 
 11
 [N]o society ever did or can consist of [a] ... homogeneous ... mass of Citizens.... In all civilized societies, distinctions are various and unavoidable. A distinction of property results from that very protection which a free Government gives to unequal faculties of acquiring it. There will be rich and poor; creditors and debtors; a landed interest, a monied interest, a mercantile interest, a manufacturing interest.... [These distinctions will produce dissention and faction.] However erroneous or ridiculous these grounds of dissention and faction may appear to the enlightened Statesman or the benevolent philosopher, the bulk of mankind ... will continue to view them in a different light. It remains then to be enquired whether a majority having any common interest, or feeling any common passion, will find sufficient motives to restrain them from oppressing the minority.
 
 
 12
 Letter from James Madison to Thomas Jefferson (Oct. 14, 1787), reprinted in 5 The Writings of James Madison 29.
 
 
 13
 Madison's distrust of government according to the will of a majority of the electorate was based on first hand observation:
 
 
 14
 In Virginia I have seen the bill of rights violated in every instance where it has been opposed to a popular current. Notwithstanding the explicit provision contained in that instrument for the rights of Conscience, it is well known that a religious establishment [would] have taken place in that State, if the Legislative majority had found as they expected, a majority of the people in favor of the measure .... Wherever the real power in Government lies, there is the danger of oppression. In our Governments the real power lies in the majority of the Community, and the invasion of private rights is chiefly to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the Constituents.
 
 
 15
 Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), reprinted in id. at 272.
 
 
 16
 In the Federalist papers Madison argued forcefully that a republican form of government was essential to preserve minority rights.
 
 
 17
 Complaints are every where heard ... that our governments are too unstable, that the public good is disregarded in the conflicts of rival parties; and that measures are too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority....
 
 
 18
 ... [Factions develop whereby] a number of citizens, whether amounting to a majority or minority of the whole, ... are united and actuated by some common impulse of passion, or of interest, adverse to the rights of other citizens, or to the permanent and aggregate interests of the community.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 ... [T]he most common and durable source of factions, has been the various and unequal distribution of property. Those who hold, and those who are without property, have ever formed distinct interests in society.... A landed interest, a manufacturing interest, a mercantile interest, a moneyed interest, with many lesser interests, grow up of necessity in civilized nations, and divide them into different classes, actuated by different sentiments and views. The regulation of these various and interfering interests forms the principal task of modern legislation ....
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 ... When a majority is included in a faction, the form of popular government ... enables it to sacrifice to its ruling passion or interest, both the public good and the rights of other citizens....
 
 
 25
 * * *
 
 
 26
 * * *
 
 
 27
 ... [In a pure democracy a] common passion or interest will, in almost every case, be felt by a majority of the whole; ... there is nothing to check the inducements to sacrifice the weaker party or an obnoxious individual....
 
 
 28
 A republic ... promises the cure for which we are seeking....
 
 
 29
 The Federalist No. 10, at 104-09 (J. Madison) (Hamilton ed. 1868) (emphasis added).
 
 
 30
 Alexander Hamilton expressed similar apprehensions for the rights of property owners in his contributions to the Federalist. He wrote: " '[A]dditional security to republican government, to liberty, and to property,' " is to be derived from the adoption of the Constitution. Id. No. 85, at 639 (A. Hamilton); and, "[A strong executive is essential] to the protection of property against those irregular and high-handed combinations, which sometimes interrupt the ordinary course of justice ...." Id. No. 70, at 522 (A. Hamilton).
 
 
 31
 Initially, Madison did not publicly support a bill of rights. Prior to the ratification of the Constitution he "opposed all previous alterations as calculated to throw the states into dangerous contentions, and to furnish secret enemies of the Union with an opportunity of promoting its dissolution." Letter from James Madison to George Eve (Jan. 2, 1789), reprinted in 5 Writings of James Madison 319-21 n. 1. Once the Constitution had been ratified by eleven states and "a very great majority of the people of America," he felt that "[c]ircumstances are now changed." Id. Madison reversed his position and supported the amendments as "providing additional guards in favor of liberty." Id. On June 8, 1789, Madison presented a draft of twelve proposed amendments to the first session of Congress. Stoebuck, A General Theory of Eminent Domain, 47 Wash.L.Rev. 553, 595 (1972). Included was the following eminent domain clause: "No person shall be ... obliged to relinquish his property, where it may be necessary for public use, without a just compensation." 1 Annals of Congress 434 (J. Gales ed. 1789). Stoebuck, A General Theory of Eminent Domain, 47 Wash.L.Rev. 553, 595 (1972).
 
 
 32
 If we look to the language of the Federal Constitution, and interpret the protection afforded property interests contained therein according to the intent of those who drafted it, it becomes unmistakably clear that the Hawaii Land Reform Act is unconstitutional. As anticipated by Madison, the Hawaii Legislature has become the instrument by which private property held by a minority of the persons within that state is to be redistributed to appease the desires of a landless majority to own residential land. The Federal Constitution and the fifth and fourteenth amendments were adopted with the express purpose of invalidating the taking of the private property from one person for the private and exclusive enjoyment by another.
 
 IV
 
 33
 We are told by Appellees that court interpretations of the Federal Constitution support the validity of the Hawaii Land Reform Act. Our analysis of the cited cases follows. Although the scope of the power of eminent domain has been only vaguely and inconsistently stated, see Berger, The Public Use Requirement in Eminent Domain, 57 Or.L.Rev. 203, 204-05 (1978), there is one instance where there is general agreement that eminent domain must not be used. The sovereign may not take the private property of A and transfer it to B solely for B 's private use and benefit. Missouri Pacific Railway Co., 164 U.S. at 417, 17 S.Ct. at 135; B. Schwartz, A Commentary on the Constitution of the United States, The Rights of Property (pt. 2) 241 (1965); see also, Calder v. Bull, 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798) (Chase, J., seriatum opinion) ("[A] law that takes property from A. and gives it to B.... is against all reason and justice ...."). None of the authorities cited by appellees has declared such an attempt constitutional.
 
 V
 
 34
 The cases upholding takings for a public use teach us that we must look at each case on an ad hoc basis: "[W]hat is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject matter in regard to which the character of the use is questioned." Fallbrook Irrigation District, 164 U.S. at 159-60, 17 S.Ct. at 63. There are several recurring facts and circumstances, however, that are present in the cases in which appellate courts have found a proper exercise of the power of eminent domain.
 
 
 35
 Courts have found that a taking has been for a public use where:
 
 
 36
 A. The taking will result in condemnation of property for an historically accepted public use.
 
 
 37
 B. The taking will result in a change in the use of the land.
 
 
 38
 C. The taking will result in a change in possession of the land.
 
 
 39
 D. The taking will result in a transfer of ownership from a private party to a governmental entity.
 
 
 40
 E. The taking will result in a de minimis condemnation necessary to facilitate the development of nearby land. None of these facts nor circumstances are present in the Hawaii Land Reform Act.
 
 
 41
 * Following the establishment of the United States Constitution, there were two major kinds of activities for which the power of eminent domain was undisputedly properly employed: mill acts and road building. See Berger, supra at 205. General mill acts allowed any owner of land upon a nonnavigable stream to build and maintain mills for manufacturing purposes. See Head v. Amoskeag Manufacturing Co., 113 U.S. 9, 20-21, 5 S.Ct. 441, 445-446, 28 L.Ed. 889 (1885). In Otis Co. v. Ludlow Manufacturing Co., 201 U.S. 140, 26 S.Ct. 353, 50 L.Ed. 696 (1906), the plaintiff challenged a general mill act enacted by Massachusetts. The Supreme Court summarily disposed of any general objection to the act on the basis that it constituted a taking for private use violative of the fourteenth amendment and noted that: "Such acts have been in force in Massachusetts ever since an act of 1714 .... The practice sanctioned by them would seem from the recitals of that act to have been still older." Id. at 151, 26 S.Ct. at 354.
 
 
 42
 The Supreme Court similarly recognized a long-standing tradition of the use of eminent domain for the purpose of building roads in Rindge Co. v. County of Los Angeles, 262 U.S. 700, 706, 43 S.Ct. 689, 692, 67 L.Ed. 1186 (1923). In Rindge, plaintiffs objected to the taking of its property for two proposed highways that were to be built entirely on its private property. Only one of the roads, the "main road," was to be connected to a public highway and only at one end; the other road, was to branch off the main road. Id. at 703, 43 S.Ct. at 691. The Court upheld the condemnation as being for a public use: "That a taking of property for a highway is a taking for public use has been universally recognized, from time immemorial." Id. at 706, 43 S.Ct. at 692.
 
 
 43
 This court found condemnation of private land for road building was a public use in Guam v. Moylan, 407 F.2d 567, 567-68 (9th Cir.1969). The rationale, however, was based upon an analogy to redevelopment cases. See id. at 568.
 
 
 44
 Where the purpose of a taking has been historically deemed to be for the public it will be upheld by the courts.
 
 B
 
 45
 The taking of private property has been upheld where there is a change in the use of the land. Often the change in the use is obvious and direct. Examples include the condemnation of land to build roads where no previous roads exist as in Rindge, 262 U.S. at 702-03, 43 S.Ct. at 691 or to build a railroad spur where no previous track exists. Hairston v. Danville & Western Railway, 208 U.S. 598, 600-01, 28 S.Ct. 331, 332-333, 52 L.Ed. 637 (1908). Similarly upheld are condemnations for the purpose of developing a power plant, Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U.S. 30, 32, 36 S.Ct. 234, 236, 60 L.Ed. 507 (1916) or developing a recreational area, United States ex rel. TVA v. Welch, 327 U.S. 546, 550, 66 S.Ct. 715, 717, 90 L.Ed. 843 (1946) (condemnation by TVA of private property for transfer to the National Park Service as part of the Great Smokey Mountains National Park); United States v. 416.81 Acres of Land, 514 F.2d 627, 629 (7th Cir., 1975) (undeveloped lands condemed for the Indiana Dunes National Lakeshore). Changes in the use of condemned property also may be upheld where the change is of a less direct nature. One such example involves the redevelopment of a community. E.g., Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (discussed infra, Sec. VI(A)).
 
 
 46
 Puerto Rico v. Eastern Sugar Associates, 156 F.2d 316 (1st Cir.), cert. denied, 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946) is an example of a case that involves both changes of a direct and indirect nature. The major agricultural holdings of a landowner were to be condemned for, inter alia, three purposes which would result in a change in the use of the property: "(1) in small parcels to individual agregados [squatters] for the erection of their dwellings, (2) in somewhat larger parcels to individual farmers for subsistence farms and (3) in large parcels by lease to expert farmers, agronomists, or other qualified persons ... for the operation of 'proportional-profit' farms ...." Id. at 319. Thus agricultural land was to be taken in some instances for building residences and in other instances for smaller farms, either upon which an individual could subsist or upon which experts would operate proportional profit farms.
 
 
 47
 In each of the foregoing cases land was condemned for the purpose of putting it to a different use.
 
 C
 
 48
 Another factual circumstance common to many constitutional takings is that the party who will possess the land after condemnation is not the same party who possesses it prior to the condemnation. The majority of the cases discussed above include examples of such a transfer of possession. One example of an instance where the possessor was the same before and after condemnation can be found in two cases where the government condemned a reversionary interest it held in leased land. Old Dominion Land Co. v. United States, 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162 (1925) (federal government can properly condemn reversionary interest in land it was leasing for possible military purpose); United States v. Certain Parcels of Land, 141 F.Supp. 300, 307 (D.Wyo.1956) (condemnation of reversionary interest in land leased by government upon which government housing had been built is for a public use), aff'd sub nom. Arp v. United States, 244 F.2d 571 (10th Cir.), cert. denied, 355 U.S. 826, 78 S.Ct. 34, 2 L.Ed.2d 40 (1957). It is important to note, however, that in both of these cases, the government, not a private party, was the beneficiary of the condemnation.
 
 D
 
 49
 Where the beneficiary of the condemnation is a governmental entity there is a strong indication that the taking is for a public use:
 
 
 50
 [W]here the land is taken by the government itself, there is not much ground to fear any abuse of the [eminent domain] power.... [When the power is delegated to a private corporation] the presumption that the intended use for which the corporation proposes to take the land is public [when declared to be so by the legislature], is not so strong as where the government intends to use the land itself.
 
 
 51
 United States v. Gettysburg Electric Railway, 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896). In two cases where the government was the beneficiary of condemned property, the government was a lessor seeking condemnation of the fee simple interest. In Old Dominion Land Company the government leased land for military purposes. 269 U.S. at 63, 46 S.Ct. at 39. When the lessor refused to renew the leases, the government initiated condemnation proceedings after an offer to purchase the land was refused. Id. The Court upheld the taking as a public use. Id. at 66, 46 S.Ct. at 40. Similarly, in Certain Parcels of Land, the government leased land upon which it built and maintained a housing project. 141 F.Supp. at 303. The owners of the land refused to renew the lease and the government sought to condemn the fee simple title. Id. The court found acquisition of the fee did not violate the public use limitation in violation of the owners' constitutional rights. Id. at 307.
 
 
 52
 Eastern Sugar Associates, 156 F.2d at 319, also involved a situation where the government could have remained in possession of the condemned land after condemnation. One of the acts that was challenged permitted the government to purchase lands and establish an organization to plant sugar cane for development of the sugar and liquor industries. Id. This was upheld as a taking for a public use. See id. at 324.
 
 E
 
 53
 Finally, courts have upheld the condemnation of land where the taking is de minimis and for the purpose of facilitating the development of nearby land.
 
 
 54
 In Strickley v. Highland Boy Gold Mining Co., 200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581 (1906), a mining company sought to condemn land for a right of way. The purpose was to erect an aerial bucket line that would result in the placement of four movable towers on the condemnees' land. Id. at 529-30, 26 S.Ct. at 302. The line would transport ore from the mines to the railway station two miles away. Id. at 529, 26 S.Ct. at 3021. Clark v. Nash, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085 (1905), involved an attempt to condemn a portion of a neighbor's land by enlarging a ditch to irrigate the condemnor's arid land to produce crops. Id. at 362, 25 S.Ct. at 676. The public use was upheld in both of these cases. In each case, the extent of the taking was minimal. The towers in Strickley were not permanent and the condemnor was under an obligation "to move the towers as often as reasonably required by the owners" in order for them to mine their land. 200 U.S. at 530, 26 S.Ct. at 302. Clark involved taking only enough land to widen by twelve inches the existing irrigation ditch which measured eighteen inches wide, twelve inches deep. 198 U.S. at 363, 25 S.Ct. at 676-677. Thus, both condemnations involved a minimal taking of land that resulted in an increased productivity of nearby land.
 
 VI
 
 55
 * The thrust of the Appellees contentions concerning the public use issue is that this court's inquiry must be restricted to whether the legislature, in enacting the Hawaii Land Reform Act, was acting within the parameters of its police powers. For example, Appellee Kahala Community Association, Inc. and Kahala Community Association Fee Purchase Fund assert the following:
 
 
 56
 Berman [348 U.S. at 26, 75 S.Ct. at 98] could not be clearer. If the legislative object is within its authority, the use of eminent domain is permissible, since that power serves simply as a means to the end. It follows that if it is constitutional to pursue an objective by police power regulations, eminent domain may be used.
 
 
 57
 Brief for Appellees Kahala Community Association, Inc. & Kahala Community Association Fee Purchase Fund at 23.
 
 
 58
 We disagree. Berman does not paint with so broad a brush. Berman involved the condemnation of buildings in a slum area for the purpose of building a new community. Congress had made a determination that the slum area was harmful to the health, safety, morals, and welfare of the public. Id. at 28, 75 S.Ct. at 100. It declared that condemnations for redevelopment pursuant to the redevelopment plan were for a public use. Id. at 29, 75 S.Ct. at 100-101. Buildings that were old, decayed, and unsafe were to be razed and replaced by new buildings. New homes, schools, churches, parks, streets and shopping centers were to be built. See id. at 34-35, 75 S.Ct. at 103-104. The court focused on the planned condemnations on an area basis rather than on astructure-by-structure basis. Id. at 34, 75 S.Ct. at 103. Thus, it was not important whether a single building represented a safety or health hazard or was unsightly. The important fact was "to redesign the whole area so as to eliminate the conditions that cause slums--the over-crowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns." Id. This transformation from slum to healthy thriving community represents a change in the use of the land.
 
 
 59
 By contrast, the Hawaii Land Reform Act will result in no change in use of the property. The property itself is currently used for residential purposes. After condemnation it will be used for residential purposes. Appellees argue that there is a change in use in that the land is now used for investment purposes; subsequent to condemnation it will only be used for residential purposes and the owner of the newly created fee simple land will treat the property differently because he knows he can stay there as long as he chooses. These alleged changes in use, however, are simply different forms of private use.
 
 
 60
 The redevelopment in Berman authorized the transfer to public agencies of land "to be devoted to such public purposes as streets, utilities, recreational facilities, and schools." Id. at 30, 75 S.Ct. at 101. The remaining land was to be redeveloped preferably by private enterprise. Id. Thus, it was possible that certain property owners would be permitted to repurchase their properties. Id. at 34, 75 S.Ct. at 103. The key in Berman is the intermediate step in which the property was transferred from the private owner to the government for a public purpose, i.e., the redevelopment of the area. In the case before us there is no such intermediate step in which the government holds the property for the accomplishment of a public purpose. The lessee simply retains possession of residential property throughout the condemnation process until he receives fee simple title. Berman does not authorize such a scheme. Nothing in Berman permits the lessee of property to take ownership of that property from the owner involuntarily through condemnation proceedings. Nothing in Berman would provide, as does the Hawaii Land Reform Act, the lessee of condemned property with greater rights to that property than the owner.
 
 
 61
 It is against this factual background that we must read its sweeping language: "Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear." Id. at 33, 75 S.Ct. at 103. The Supreme Court also stated in Berman that: "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." Id. at 32, 75 S.Ct. at 102 (emphasis added). We read this language as requiring the judiciary to scrutinize carefully any legislative attempt to take private property so as to determine if it is in violation of any constitutional provision. The fifth amendment is specific: "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const.Amend. V; see also, cases cited Sec. VI(B) infra (role of judiciary in determining public use). To hold, as the district court below did, that the public use limitation is subsumed under a "police power/due process analysis," Midkiff, 483 F.Supp. at 67, would be to ignore the explicit language of the constitution and to disregard the fifth amendment protections granted to citizens of the states under the fourteenth amendment. See, e.g., Missouri Pacific Railway, 164 U.S. at 417, 17 S.Ct. at 135. Such a result is untenable. Indeed, the Supreme Court has held that merely because the legislature has the power to regulate private property does not allow it to take that property without just compensation in violation of the fifth amendment. Kaiser Aetna v. United States, 444 U.S. 164, 179-80, 100 S.Ct. 383, 392-393, 62 L.Ed.2d 332 (1979). It follows that because the state legislature has the power to regulate private property does not allow it to take that property for a nonpublic use in violation of the fourteenth amendment.
 
 B
 
 62
 Appellees, citing Old Dominion Land Co., 269 U.S. at 66, 46 S.Ct. at 40, also argue that review by this court is limited to the question of whether the determination of the existence of public use by the Hawaiian Legislature, Hawaii Rev.Stat. Sec. 516-83(a)(12)[4] "is shown to involve an impossibility." Appellees direct our attention to the following cases as well: Berman, 348 U.S. at 32, 75 S.Ct. at 102 (citing T.V.A., 327 U.S. at 552, 66 S.Ct. at 718; Old Dominion Land Co., 269 U.S. at 66, 46 S.Ct. at 40); Gettysburg Electric Railway Co., 160 U.S. at 680, 16 S.Ct. at 429; Southern Pacific Land Co. v. United States, 367 F.2d 161, 162 (9th Cir.1966), cert. denied, 386 U.S. 1030, 87 S.Ct. 1485, 18 L.Ed.2d 591 (1967). The cases cited by Appellees, however, involved the review of a congressional determination that there was a public use, not the review of a state legislative determination. In T.V.A., 327 U.S. at 552, 66 S.Ct. at 718 the Supreme Court stated that review of a congressional public use declaration is not the same as the review of a state legislative determination: "But whatever may be the scope of the judicial power to determine what is a 'public use' in Fourteenth Amendment controversies, ... when Congress has spoken on this subject 'Its decision is entitled to deference until it is shown to involve an impossibility.' " (quoting Old Dominion Land Co., 269 U.S. at 66, 46 S.Ct. at 40 (emphasis added)). Where a state legislative determination is involved: "[i]t is well established that ... the question what is a public use is a judicial one." Cincinnati v. Vester, 281 U.S. 439, 446, 50 S.Ct. 360, 362, 74 L.Ed. 950 (1930); This matter involves a review, under the fourteenth amendment, of a state legislative determination. This court must properly make the ultimate determination of whether the use is public.
 
 
 63
 Madisonville Traction Co. v. Saint Bernard Mining Co., 196 U.S. 239, 25 S.Ct. 251, 49 L.Ed. 462 (1905) cited by one of the appellees for the proposition that courts should pay deference to state legislative determinations, is particularly appropriate here. The Court is explicit: " 'It is erroneous to suppose that the legislature is beyond the control of the courts in exercising the power of eminent domain .... For if the use be not public ... the legislature cannot authorize the taking of private property against the will of the owner, notwithstanding compensation may be required.' " Id. at 252, 25 S.Ct. at 256 (quoting Tracy v. Elizabethtown, Lexington & Big Sandy Railroad, 80 Ky. 259, 265 (1882)). Moreover, were Congress to enact a statutory provision that would allow condemnation of A's private property for transfer to B, solely for B's private use, this court would necessarily find such action contrary to the fifth amendment whether or not congress declared such proceedings to be for a public purpose. See, e.g., Colchico v. United States, 286 F.Supp. 507, 509 (N.D.Cal.1968) (court to review whether federal taking for a public use); United States v. 23.9129 Acres of Land, 192 F.Supp. 101, 102 (N.D.Cal.1961) ("This court need not, and will not, stand idly by and allow [federal] administrative officials to take private property arbitrarily, capriciously, in bad faith, or for what is essentially a private purpose." (emphasis added)).
 
 VII
 
 64
 When we strip away the statutory rationalizations contained in the Hawaii Land Reform Act, we see a naked attempt on the part of the state of Hawaii to take the private property of A and transfer it to B solely for B's private use and benefit.
 
 
 65
 The founders of this nation sought to give constitutional protection to minority rights. They wisely foresaw that attempts would be made by the states to take away the private property rights of the landed minority. Our Federal Constitution and the Bill of Rights were designed to prevent such abuses by the majority. That Constitution now compels us to find that the Hawaii Land Reform Act violates the public use limitation of the fifth and fourteenth amendments. Those provisions of the Hawaii Reform Act that provide for the condemnation of certain residential property are facially unconstitutional.
 
 
 66
 The decision of the district court is REVERSED and REMANDED for further proceedings consistent with the views expressed in this opinion.
 
 
 67
 POOLE, Circuit Judge, concurring.
 
 
 68
 I concur in Judge Alarcon's careful and well-researched opinion and in his conclusion that the Hawaii Land Reform Act violates the Fifth and the Fourteenth Amendments to the Constitution of the United States. I recognize that another member of this court, whose opinion is of value and entitled to thoughtful consideration, expresses a contrary view.
 
 
 69
 Nonetheless an independent review convinces me that in light of all considerations of logic, of the compelling authority of precedent, and of the Constitution itself, the Hawaii Land Reform Act is unconstitutional. It is my further opinion that the United States District Court properly undertook to decide that issue but reached a manifestly erroneous conclusion in upholding the Act.
 
 
 70
 But however firm these conclusions may appear to me, I am concerned that we not seem to have, as charged in our brother's scold, "cavalierly" ventured to decide these legal issues; asked the "wrong" questions and gotten "wrong" answers; or foresworn that "judicial modesty" which ought to have warned that we are not in position (as presumably are the Hawaiian legislature and courts) "to judge the effectiveness and constitutionality of any attempt at reform." I therefore think it useful to set forth in calmness and reason such of my own analysis as may indicate why the dissent is mistaken. For it is incorrect that we should have abstained; and it is incorrect that there was not squarely presented to a court of the United States an unavoidable constitutional issue which this court was bound to meet and which, I submit, we now have properly decided.
 
 
 71
 I. Abstention.
 
 
 72
 First of all, we have decided this constitutional issue because it is before us and as a court of the United States we are obligated to hear and decide those issues over which we have jurisdiction. Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). It is that obligation, not pride or immodesty, that makes federal abstention "the exception, not the rule." Id. See also Knudsen Corp. v. Nevada State Dairy Commission, 676 F.2d 374, 376-78 (9th Cir.1982); Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 819-21 (9th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). Abstention is only appropriate " 'in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.' " Colorado River, 424 U.S. at 813, 96 S.Ct. at 1244 (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1062-1063, 3 L.Ed.2d 1163 (1959)). Since the decision to abstain involves the district court's discretionary exercise of its equitable powers, it is reviewed under the abuse of discretion standard. Turf Paradise, 670 F.2d at 819. It would have been an abuse of discretion had the district court abstained.
 
 A. Pullman Abstention
 
 73
 Four general categories of abstention have been generally recognized. The first, Pullman abstention, is appropriate where a federal constitutional issue may be avoided or presented in a different light by resolution of an issue under state law. Colorado River, 424 U.S. at 814, 96 S.Ct. at 1244-1245; Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Knudsen Corp., 676 F.2d at 377. For example, a state court might interpret the provisions of a challenged statute so as to moot the federal constitutional issue raised. See, e.g., Red Bluff Drive-In, Inc. v. Vance, 648 F.2d 1020 (5th Cir.1981), cert. denied, 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982). Here, however, as Judge Alarcon points out, the Hawaii Land Reform Act specifically provides that its provisions are intended to serve "a public use and purpose." Hawaii Rev.Stat. Sec. 516-83(a)(12). Therefore, state courts of Hawaii could not interpret the statute to avoid the "public use" issue and hence federal review is not thereby spared.
 
 
 74
 Pullman abstention may also be appropriate where a state court may find that the challenged statute violates the state's own constitution. But such abstention is limited to application of a specialized state constitutional provision with no clear counterpart in the federal constitution. See Santa Fe Land Improvement Co. v. City of Chula Vista, 596 F.2d 838, 840-41 n. 3 (9th Cir.1979); Pue v. Sillas, 632 F.2d 74, 80-81 (9th Cir.1980); C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4242 at 462-63 (1978). The Hawaii Constitutional Provision concerning eminent domain imposes the same "public use" standard as required under the Fifth and Fourteenth Amendment due process clauses of the United States Constitution. See Hawaii Const. art. I, Sec. 20[1]; Missouri Pacific Railway v. Nebraska, 164 U.S. 403, 417, 17 S.Ct. 130, 135, 41 L.Ed. 489 (1896). Therefore Pullman abstention to permit application of this "mirror image" state constitutional provision would not be appropriate.[2] See, e.g., Examining Board of Engineers, Architects, and Surveyors v. Flores de Otero, 426 U.S. 572, 598, 96 S.Ct. 2264, 2279, 49 L.Ed.2d 65 (1976) (abstention not appropriate under state constitutional provision similar to federal constitution equal protection clause); Pue v. Sillas, 632 F.2d at 81.
 
 B. Burford Abstention
 
 75
 Abstention may also be appropriate under the standards originally set out in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), to avoid "federal intrusion into matters which are largely of local concern and which are within the special competence of local courts." International Brotherhood of Electrical Workers, Local Union No. 1245 v. Public Service Commission, 614 F.2d 206, 212 n. 1 (9th Cir.1980). In considering Burford abstention this court has examined whether the state channels into a single court lawsuits challenging the state agency's actions, whether the federal issues are inextricably linked to the state law issues, and whether federal adjudication would interfere with the state's efforts to maintain a consistent policy. See Knudsen Corp., 676 F.2d at 377; International Brotherhood of Electrical Workers, 614 F.2d at 211.
 
 
 76
 Hawaii has not created specialized courts to hear cases arising under the Act and the federal due process issue is not linked to complex state law issues. Moreover, we have recently specifically refused to apply Burford abstention to cases involving zoning and land use questions, even though, as appellees suggest, issues regarding land use and regulation are special local concerns. See International Brotherhood, 614 F.2d at 211; Isthmus Landowners Association v. California, 601 F.2d 1087 (9th Cir.1979) (challenge to coastal zoning regulations); Rancho Palos Verdes Corp. v. City of Laguna Beach, 547 F.2d 1092 (9th Cir.1976) (zoning challenge); Santa Fe Land Improvement Company v. City of Chula Vista, 596 F.2d 838 (9th Cir.1979). Thus, Burford abstention is not appropriate in this case.[3]C. Prudential Abstention--Colorado River
 
 
 77
 The third ground for abstention, recognized in Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), stems from principles of " 'wise judicial administration.' " 424 U.S. at 817, 96 S.Ct. at 1246 (quoting Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). A district court may abstain where "exceptional circumstances * * * indicate that concurrent jurisdiction by state and federal courts is likely to cause piecemeal litigation, waste of judicial resources, inconvenience to the parties, and conflicting results." Tovar v. Billmeyer, 609 F.2d 1291, 1293 (9th Cir.1979). However, given the "unflagging obligation" of the federal courts to exercise their jurisdiction, the applicability of this doctrine is even more limited than the circumstances normally justifying abstention. Colorado River, 424 U.S. at 818, 96 S.Ct. at 1246-1247. Thus in Colorado River the Court found that "exceptional circumstances" existed to dismiss the federal action in favor of a pending state action because of the Congressional policy set out in the McCarren Amendment to avoid piecemeal adjudication of water rights--a policy reflected in traditional rules governing the adjudication of property matters, and also because state law had established a single continuous proceeding for the adjudication of Colorado river water disputes. No comparable factors here favor adjudication in state court, and therefore the heavy burden necessary to justify abstention has not been met.
 
 D. Younger Abstention
 
 78
 A fourth area for abstention is based on the principles of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Younger held abstention appropriate where the federal claimant sought to restrain ongoing state criminal judicial proceedings. The principle has subsequently been extended beyond the criminal context to state proceedings which involve "important state interests." Middlesex County Ethics Committee v. Garden State Bar Association, --- U.S. ----, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). Thus, the Supreme Court has specifically approved abstention to avoid interference with civil contempt proceedings initiated by a state court, Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); attachment proceedings brought by a state to recover welfare payments procured by fraud, Trainor v. Hernandez, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); a custody proceeding in which the state sought to recover custody of abused children, Moore v. Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); and state disciplinary proceedings for members of the bar, Middlesex, 102 S.Ct. at 2523 ("The importance of the state interest in the pending state jurisdiction proceeding * * * calls Younger abstention into play"); and id. at 2524 ("No proceedings have occurred on the merits and therefore no federal proceedings on the merits will be terminated by application of Younger principles"). Since the federal claimant could raise the constitutional claims in the state proceedings, the interests of comity and federalism precluded federal interference in the state proceedings. See Hart & Wechsler, The Federal Courts and the Federal System 280-82 (Supp.1981).
 
 
 79
 Although the Supreme Court has not addressed the issue, in Ahrensfeld v. Stephens, 528 F.2d 193 (7th Cir.1975), the Seventh Circuit has held that a state's interest in eminent domain proceedings constitutes so important a governmental interest that Younger abstention is appropriate. That court reasoned that since the federal constitutional claims could be raised in the ongoing state court proceedings it was appropriate for the federal court to abstain "so as not to interfere with state sovereignty." 528 F.2d at 200.
 
 
 80
 Ahrensfeld, however, relied only in part on Younger's abstention doctrine. The court also found that "other circumstances" were present which made Pullman abstention appropriate because of an unresolved issue regarding state valuation standards.[4] 528 F.2d at 199-200. But as indicated above, Pullman abstention is not appropriate here. Also, as already said, this circuit has concluded that a state's interest in land use and regulation does not automatically justify abstention under the Burford doctrine, which, like Younger, contemplates deference where there is an ongoing state judicial proceeding. See Middlesex County Ethics Committee, supra; Zablocki v. Redhail, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n. 5, 54 L.Ed.2d 618 (1978). Such ongoing action must begin "before any proceedings of substance on the merits have taken place in the federal court." Hicks v. Miranda, 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975); Middlesex, 102 S.Ct. at 2524. Unless such an action is underway the interests expressed in Younger of avoiding duplicative litigation and interference with the state judicial system are not applicable. And proceeding in the federal action in such circumstances is not to be regarded as reflecting a lack of confidence in the state court's adjudication of constitutional issues because "the relevant principles of equity, comity, and federalism have little force in the absence of a pending state proceeding." Steffel v. Thompson, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974).
 
 
 81
 Appellants in this case filed their district court complaint in February, 1979. At that time the only extant proceedings at the state level were public hearings being conducted by the Hawaii Housing Authority as required under the Hawaii Land Reform Act before instituting condemnation of certain of appellant's residential tracts. See Hawaii Rev.Stat. Sec. 516-22.[5]
 
 
 82
 The dissent refers to four state court condemnation suits which at various times were pending in the state court. All were settled without trial. Three were terminated before the district court ruled on the summary judgment motions before it. The fourth remained pending after the final judgment was entered here, but it too was settled. The dissent misreads the law in its premise that the mere filing of a condemnation action would proprio vigore bring into play the requirement of abstention. As Justice Brennan stated in Steffel v. Thompson, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974):
 
 
 83
 "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. [Citations omitted.]
 
 
 84
 In May, 1979, the district court heard appellants' motion for a preliminary injunction. It found that on the merits appellants were unlikely to prevail on their general due process challenge, but that the statute's mandatory arbitration and valuation provisions were facially unconstitutional. Accordingly, the court held that the state administrative condemnation proceedings could proceed but it enjoined the operation of the objectionable arbitration and valuation provisions.[6] The Hawaii Housing Authority did not actually file the first of its eminent domain lawsuits in state court against appellants until September, 1979, shortly after the parties in district court had begun filing motions for summary judgment.
 
 
 85
 Thus by the time the state proceedings were instituted in this case the federal action was well beyond "the embryonic stage." Doran v. Salem Inn, Inc., 422 U.S. 922, 929, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1975). Under those circumstances abstention was not appropriate. See id. (Younger abstention not applicable where district court issued preliminary injunction prior to institution of state criminal action); Housworth v. Glisson, 485 F.Supp. 29 (N.D.Ga.1978) (hearing for injunctive relief on plaintiff's likelihood of success qualifies as proceedings of substance on the merits).
 
 
 86
 Moreover, it appears that the state attorney general never raised the Younger issue at any time before the district court.[7] Although the parties may not waive the applicability of Pullman abstention, see e.g., Santa Fe Land Improvement Co., 596 F.2d at 840, the Supreme Court has specifically indicated that the Younger doctrine need not be considered if not invoked by the state:
 
 
 87
 If the state voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system.
 
 
 88
 Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 480, 97 S.Ct. 1898, 1904, 52 L.Ed.2d 513 (1977). Accordingly, in submitting the issue of the statute's constitutionality to the district court in this case, it appears that the Hawaii attorney general effectively waived his claim for Younger abstention. See Universal Amusement Co. v. Vance, 587 F.2d 159, 163 n. 5 (5th Cir.1978), aff'd, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); Evansville Book Mart, Inc. v. City of Indianapolis, 477 F.Supp. 128, 130 (S.D.Ind.1979); Wright, Miller & Cooper, Federal Practice and Procedure Sec. 4252, at 547-48 (1978). We need not, however, rely solely on waiver, for independently it is clear that Younger does not apply.
 
 
 89
 In sum, none of the circumstances recognized by the federal courts as calling for abstention are present here. Therefore the district court did not abuse its discretion in proceeding to decide the constitutional issue before it.
 
 II. Public Use
 
 90
 The Hawaii Land Reform Act, Part II, authorizes eminent domain proceedings for the purpose of transferring from the fee owners to existing lessees the fee simple title to single family residential lots held under long term ground leases. Haw.Rev.Stat. Secs. 516-21 through 45. The act applies to residential lots of not more than 2 acres located in development tracts of not less than 5 acres and held under leases for terms of twenty years or more. Haw.Rev.Stat. Sec. 516-1(2), (5), (11).
 
 
 91
 Condemnation proceedings are actually initiated on petition of lessees desiring to obtain the fee title to their leased property. The statute requires that the application be on behalf of the lessees of 25 lots or 50% of the lots in a development, whichever is less. Haw.Rev.Stat. Sec. 516-22.
 
 
 92
 While the statute permits the state to appropriate funds and issue bonds for the purpose of implementing the statute, it appears that (except for administrative overhead) the state uses no public monies to acquire property under the statute. The condemnation award and incidental costs of condemnation are paid by the private lessee acquiring a given property. Haw.Rev.Stat. Secs. 516-30, -33, -33.5.
 
 
 93
 Under the statute, the Hawaii Housing Authority may elect to condemn only those lots which lessees have applied to purchase. Haw.Rev.Stat. Sec. 516-22. While the Housing Authority is required to find that the acquisition "will effectuate the public purposes" of the statute, it need not find existence of a shortage of fee simple property in the county in which a condemned lot is located. Compare 1967 Haw.Sess.Laws, Act 307 Sec. 11 and Haw.Sess.Laws, Act 184 Sec. 2(6) with 1976 Haw.Sess.Laws, Act 242 Sec. 2 and Haw.Rev.Stat. Sec. 516-22.
 
 
 94
 In addition to the condemnation provisions, the Hawaii statute also provides new safeguards to lessees of residential properties who continue under long term leases. Haw.Rev.Stat., Part III. Rights of Lessees, Secs. 516-61 through 70. Among these are rent control and guarantees that such lessees may sell or assign their leasehold interests, and may cure default, this presumably easing the structures of the landlord-tenant rigid relationships.
 
 
 95
 But no restrictions are placed by the Act on the use or alienation by a lessee-turned-feeholder of his property interest. If the new owner elects to let out to a new tenant under a long-term lease, that tenant does not receive protections of Part III. The new feeholder may therefore turn around and sell that property subject to a long-term ground lease in which he now holds a reversionary interest, thereby continuing the very cycle and effectively frustrating the avowed purpose of increasing the incidence of fee simple residential properties in Hawaii. Because the property is no longer part of a minimum five-acre tract, the lessee-turned-lessor's property is not subject to disfeasance by operation of the eminent domain scheme under which the former tenant, now a landlord of a long-term lease, acquired the interest. See Haw.Rev.Stat. Sec. 516-1(5). Alternatively, of course, the new feeowner may elect to retain and live on his land as before, or may sell or lease a partial or entire interest therein, just as prior to the taking he and his former landlord had such options according to their respective holdings.
 
 
 96
 Thus the statute permits, but neither requires nor contemplates, a change in the use of the land. It merely provides a procedure for the involuntary transfer of title in the affected property from the disfavored lessor to the now advantaged lessee. Appellants argue that a condemnation scheme which results in change neither in use nor in possession, and whose sole effect is to transfer title from A (the lessor) to B (the lessee) does not constitute a taking for a public purpose, and so violates the fourteenth amendment. Judge Alarcon agrees, and I concur.
 
 
 97
 The taking by a State of the private property of one person or corporation, without the owner's consent, for the private use of another, is not due process of law and is a violation of the Fourteenth Article of Amendment of the Constitution of the United States.
 
 
 98
 Missouri Pacific Railway v. Nebraska, 164 U.S. 403, 417, 17 S.Ct. 130, 135, 41 L.Ed. 489 (1896). "[O]ne person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937) (citing Hairston v. Danville & Western Railway Co., 208 U.S. 598, 605, 28 S.Ct. 331, 334, 52 L.Ed. 637 (1908); Rindge Co. v. County of Los Angeles, 262 U.S. 700, 705, 43 S.Ct. 689, 692, 67 L.Ed. 1186 (1923); Cincinnati v. Vester, 281 U.S. 439, 446, 449, 50 S.Ct. 360, 362, 363, 74 L.Ed. 950 (1930). In my view, the Hawaii statute accomplishes precisely this invalid result, for if it does not constitute a transfer "for the private use of another," that term can have no meaning.
 
 
 99
 The legislature has set forth a number of findings in its attempt to clothe with the trappings of "public use" what is no more than a transfer for the private use of another. See e.g., Haw.Rev.Stat. Sec. 516-83. Determining what constitutes a public use for fourteenth amendment due process examination of eminent domain proceedings, however, is a justiciable question ultimately to be determined by the court, and not the legislature. Thus, while a legislative determination of public use is entitled to considerable deference, it is not binding on this court. Hairston v. Danville & Western Railway, 208 U.S. 598, 606, 28 S.Ct. 331, 334, 52 L.Ed. 637 (1908); United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 551-52, 66 S.Ct. 715, 717-718, 90 L.Ed. 843 (1946); Cincinnati v. Vester, 281 U.S. 439, 446, 50 S.Ct. 360, 362, 74 L.Ed. 950 (1930); 2A J. Sackman & P. Rohan, Nichols' The Law of Eminent Domain, Sec. 7.4 (1981).
 
 
 100
 It is true that "public use" is not synonymous with "use by the public," and that a state may condemn property to be sold or leased to individuals as Judge Alarcon has explained, citing inter alia, Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); Strickley v. Highland Boy Gold Mining Co., 200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581 (1906); Clark v. Nash, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085 (1905); Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896); Puerto Rico v. Eastern Sugar Associates, 156 F.2d 316 (1st Cir.), cert. denied 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946). But the private benefit must be an incidental one, and not the dominant purpose of the taking. Adams v. Housing Authority, 60 So.2d 663 (Fla.1952); Baycol, Inc. v. Downtown Development Authority, 315 So.2d 451 (Fla.1975).
 
 
 101
 [E]minent domain cannot be employed to take private property for a predominately private use; it is, rather, the means provided by the constitution for an assertion of the public interest and is predicated upon the proposition that the private property sought is for a necessary public use. It is this public nature of the need and necessity involved that constitutes the justification for the taking of private property, and without which proper purpose the private property of our citizens cannot be confiscated, for the private ownership and possession of property was one of the great rights preserved in our constitution and for which our forefathers fought and died; it must be jealously preserved within the reasonable limits prescribed by law.
 
 
 102
 Id. at 455 (footnotes omitted).
 
 
 103
 In determining public use, the court may consider extrinsic facts and examine the statute as a whole to "discover the dominant purpose of the taking." 2A J. Sackman & P. Rohan, Nichols' The Law of Eminent Domain Sec. 7.4. "In short, the constitutional protection against the taking of public property for private use cannot be evaded by any colorable declarations that the use is public however formally and officially made." Id.
 
 
 104
 Upon examination of the statute and the evidence of record, I conclude that the Hawaii Land Reform Act's eminent domain provision cannot be saved as an exercise of police power. It is beyond doubt that legislation need not be wise, nor the best means for fulfilling relevant social and economic objectives. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 317, 96 S.Ct. 2562, 2568, 2569, 49 L.Ed.2d 520 (1976); Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). However, when as here the drastic effects of a statute contrast so starkly with its professed goals, leaving in shadow the nexus of reasonable relationship to those goals, one may question whether a public purpose in fact exists.
 
 
 105
 The Hawaii Land Reform Act proclaims its purpose to be the alleviation of the shortage of fee simple residential land in Hawaii. Yet, as set forth above (see page 13, lines 23-26), the legislature has amended the statute to delete a requirement that the Housing Authority, to whom is committed the power and decision to take, first find a shortage of fee simple housing in areas in which acquisitions under the statute are to be made.
 
 
 106
 The legislature has determined that the concentration of residential lands in the hands of a few holders who choose to lease under long term leases has caused shortage and has resulted in an inflation of land values. In fact, the statute itself is so structured that it can only aggravate this shortage and resultant inflation of land values. The Hawaii Circuit Court has found as fact that in late years the large landholders have made residential homesites available, albeit through the traditional leasehold arrangements. Midkiff v. Amemiya, Civ.No. 47103 (Haw. 1st Cir.) (Findings of Fact).
 
 
 107
 But those problems with the Act, while telling of its nature, could not alone condemn it entirely. What does infect it with unconstitutionality is that it authorizes an agency of the state, upon the application of a tenant, to divest his landlord of the latter's entire property and to convey it to the erstwhile tenant in fee for the sole purpose of constituting that tenant as the owner. The statute does not accomplish this transformation merely incidentally en route to the effectuation of other, different, presumably more urgent objectives; nor is it that in its unreconstituted form, the present right of freeholding threatens, interferes with, delimits, pollutes or offends against the commonweal. The divestiture is single-minded and patent of purpose: it strips the owner of the fee and vests the fee in the tenant. Otherwise, there is not an iota of change. Not a stick, stone, blade of grass, or flake of paint is altered; the use continues precisely as it was before; the awesome mechanism of taking becomes functus officio in the instant of its exercise; its only service is to sever ownership from A and bestow the same on B.
 
 
 108
 Indeed a unique and drastic analogue of "eminent domain" is created by this legislation; but that characterization would not alone be cause to strike it down. Indeed the purported justification is that it responds to a perceived need; but so also have many legislative enactments since December 15, 1791--the ratification date of the "Bill of Rights"--proclaimed their aim to attend outstanding needs, yet failed in passing constitutional muster. The problem which this Act cannot overcome is not its novelty or boldness or philosophical drift or internal deficiencies. The problem is in the bar of the Fifth Amendment which reads in simple words: "[N]or shall private property be taken for public use, without just compensation."
 
 
 109
 It is not enough that a "just" price be paid when the public (the state) seeks to invade the right of lawful private ownership: the use for which the taking is made must itself be for a public purpose. It is not a public purpose to take the property of one person in order that it may become the private property of another. It is said that "outsiders" may have a problem "in comprehending the constitutionality" of this legislation. (Dissent, page 808.) A commentator, quoted in extenso by the dissent, id., has written that one factor which a reviewing court might consider, "if only subconsciously, is the current political reality that in much of the world land reform is essential if democratic forms of government are to emerge or to prevail." That writer's thesis is that elsewhere "redistribution of the land" is taken for granted, and that it would be anomalous for "this government" to insist on land reform elsewhere if "its own Constitution prevents similar reforms in the American states."However interesting a commentary on comparative international polity, that analogy and that rationale are both inapposite in the face of the organic restraints which our Constitution was intended and is held to impose upon governmental authority. We cannot foresee what the future may hold, and unborn generations may yet witness triumph of the right to such "redistribution" of the property of others. But before that Huxleyan advent, there will have to have come some change in Amendment V, with a corresponding disfavor of the principle, known to us not later than Magna Carta, that one's freehold may be taken only "by lawful judgment of his peers, or by the law of the land."[8]
 
 The legislature has found:
 
 110
 Due to such shortage of fee simple residential land and such artificial inflation of residential land values, the people of the State have been deprived of a choice to own or take a lease of the land on which their homes are situated and have been required instead to accept long term leases of such land which contain terms and conditions that are financially disadvantageous, that restrict their freedom to fully enjoy such land and that are weighted heavily in favor of the few landowners of such land....
 
 
 111
 Haw.Rev.Stat. Sec. 516-83(3).[9] In fact, however, as the Circuit Court also found, on Oahu, the most populous Island with the most acute housing shortage, "there is only a 10 percent difference in the price between fee simple properties and comparable leasehold properties." Midkiff v. Amemiya, supra (Findings of Fact). The point is not that housing shortages do not exist in the Islands; it is that shortages of similar kind and degree exist in other of the 50 states, and so do constitutional limitations.
 
 
 112
 The thrust of the statute, therefore, is not nearly so much the providing of residential housing where it may not reasonably be had; it aims and objectives are to leave the residential supply as it exists, but to shift the fee from present owners to their lessees. And this in fact is all that the statute does.
 
 
 113
 In the Act before us the state legislature has simply decided that it prefers B's ownership of the land to A's, and the vesting of B with ownership of property heretofore lawfully held by A constitutes the statute's only substantive change. When, as here, the only variable presented is whether A or B holds title to the land, the public purpose vanishes. See Thompson v. Consolidated Gas Utilities Corp., 300 U.S. at 80, 57 S.Ct. at 376.[10]
 
 
 114
 I conclude therefore that the taking authorized by the Hawaii Land Reform Act is not a taking "by the law of the land" and is therefore invalid under the Fifth and Fourteenth Amendments to the Constitution of the United States.
 
 FERGUSON, Circuit Judge, dissenting:
 
 115
 The majority cavalierly decides that the legislature of Hawaii is forbidden by the federal constitution to carry out its program of residential land reform. In so doing, the majority has decided, wrongly, an issue that neither this court nor the district court should have reached in the first place. The majority has substituted its opinion for the careful judgment of the Hawaii state courts, and the Hawaii legislature, in "a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." Canton v. Spokane School Dist. # 81, 498 F.2d 840, 845 (9th Cir.1974), citing Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 498, 61 S.Ct. 643, 644, 85 L.Ed. 971 (1941). The majority has interfered with a state legislature's exercise of a power which is "an inherent attribute of sovereignty," County of San Mateo v. Coburn, 130 Cal. 631, 634, 63 P. 78 (1900), and which is " 'universally' recognized and 'necessary to the very existence of government.' " City of Oakland v. Oakland Raiders, Ltd., 32 Cal.3d 60, 64, 183 Cal.Rptr. 673, 646 P.2d 835 (1982). "The right is the offspring of political necessity; and it is inseparable from sovereignty, unless denied by its fundamental law." Kohl et al. v. United States, 91 U.S. 367, 372, 23 L.Ed. 449 (1875). The majority labels the Hawaii legislature's attempt to exercise this fundamental sovereign power a "tyranny of the majority." But "concrete cases are not to be decided by calling names." Puerto Rico v. Eastern Sugar Associates, 156 F.2d 316, 324 (1st Cir.1946). My research has disclosed no case supporting the conclusion that the statute here at issue is unconstitutional on its face. To the contrary, precedent and common sense both point quite plainly to the opposite conclusion. I therefore dissent.
 
 
 116
 One commentator has already anticipated the problem that outsiders would have in comprehending the constitutionality of the Hawaii Land Reform Act:
 
 
 117
 The almost instinctive feeling that the Hawaii Act is radical may be based to some degree on an emotional reaction rooted in the assumption that since land is easily available on the open market to anyone who wants to buy it, no man should be forced to sell his land to another. This assumption, although valid in most parts of continental United States, is not valid in the island State of Hawaii.
 
 
 118
 One factor that argues in favor of the Act and may be considered by the Court, if only subconsciously, is the current political reality that in much of the world land reform is essential if democratic forms of government are to emerge or to prevail. In both Asia and Latin America it is taken for granted that a redistribution of the land must be accomplished as a vital first step in carrying out reforms that will allow democratic governments to be established and survive. Land reform is necessary for the economic, political, and social health and stability of many of these nations.
 
 
 119
 It would be anomalous and somewhat hypocritical if the United States Government were to insist that land reform be undertaken in other countries when its own Constitution prevented similar reforms in the American States. True, there is a substantial difference between the State of Hawaii and a country like South Vietnam. The most obvious one is the difference between their economies--there are no peasants in Hawaii. But to recognize that difference is not to say that for the long-term political and economic health of Hawaii, land reform here is not as necessary as land reform is to the long-term development of South Vietnam. The existence of a monopoly that can control scarce land resources in Hawaii is dangerous because control of land in an island State represents more than the economic power that the land represents in dollar value.
 
 
 120
 The state's right to control other types of monopolies is clear; Hawaii's right to control and break up a land monopoly should be at least as clear considering the greater danger such monopoly poses to the political and economic health of an island State.
 
 
 121
 Conahan, Hawaii's Land Reform Act: Is It Constitutional?, 6 Hawaii B.J. 31, 53 (1969) [hereinafter cited as Hawaii's Land Reform Act ].
 
 
 122
 The majority begins by asking the wrong question. It believes that it "must decide whether the Federal Constitution permits a state to take the private property of A and transfer its ownership to B for his private use and benefit." Maj. op., ante, at 790. But the land reform program does not simply transfer land from one owner to another owner for his private use and benefit; it transfers land from a handful of large owners to numerous small owners. Moreover, the "transfer" here can be accomplished only through the intervention of the Hawaii Housing Authority, which must find that the transfer accomplishes the public purposes of the Land Reform Act. Thus, the majority's analysis begins with a distorted account of what the statute actually does. The real question in this case is not whether a naked transfer of title solely for a person's private use is an unlawful taking. The real question is whether the legislature of Hawaii may, pursuant to a plan carefully tailored to guarantee due process and just compensation, bring about the redistribution of privately held land where the legislature has found (a) that the concentration of such land in the hands of a few landholders is a cause of great social and economic harm to the public and (b) that the distribution of such land in small parcels to many persons will be to the public's benefit and advantage. Having asked the wrong question, the majority predictably arrives at the wrong answer.
 
 I. COMITY AND FEDERALISM
 
 123
 As I see it, the only questions presented to us by this case are, first, whether the district court should have abstained from deciding it on the merits; and, second, if not, what is the appropriate standard of review to be applied by a federal court in passing upon a facial challenge to a legislature's exercise of the power of eminent domain. The answers to both questions emanate from the joint principles of judicial restraint, comity and federalism, which counsel courts not to interfere unnecessarily with the exercise of legislative functions by substituting their judgment for that of legislatures on primarily legislative functions, and which counsel the federal courts not to interfere unnecessarily with the exercise of fundamental state powers.
 
 
 124
 Issues concerning land use within a state are not easily made a subject of federal concern. It is an essential attribute of a state's sovereignty to be able to use land to promote the commonweal. That is why a state may take land for a public use. Whether land is used to promote the common good must invariably depend on facts and circumstances that will vary from state to state.
 
 
 125
 Abstention, and, failing that, deference to legislative judgment, was uniquely appropriate in this case not only because the Land Reform Act is significant to the Hawaiian people, but because the case will now have an unfortunate impact on any future attempt by any state to experiment with land reform, regardless of whatever compelling needs may exist in a particular state. Hawaii faces a very difficult land situation. Judicial modesty should prevent us from thinking that we are in a better position than the Hawaiian legislature and courts to judge the effectiveness and constitutionality of any attempt at reform.
 
 
 126
 The majority ignores the nature of our federalist compromise. The Constitution could have decided that states are merely administrative organs of the central government, but in fact the Constitution decided otherwise. States have been granted independent law-making power, the purpose of which is to provide their people with public benefits and services. There can be no more basic "benefit" than land.
 
 
 127
 One advantage often cited in favor of our federal system is that it allows a high degree of free play to the states. "It is one of the happy incidents of the federal system," Justice Brandeis wrote, "that a single courageous state may if its citizens choose serve as a laboratory and try social and economic experiments without risk to the rest of the country." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 387, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).
 
 
 128
 The Hawaii Land Reform Act is an important state experiment. The recognition that control over land is crucial to the existence of "the state as a state" is implicit in federal court decisions abstaining in state eminent domain proceedings. As the majority recognizes, citing Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28, 79 S.Ct. 1070, 1073, 3 L.Ed.2d 1058 (1959), "a state's eminent domain proceeding is intimately involved with sovereign prerogative." Maj. op., ante, at 789, n. 1.
 
 
 129
 The power of eminent domain is a fundamental sovereign power of the states. Its exercise has always been a legislative function. The majority's decision to declare facially unconstitutional the statute before us is thus an extraordinary exercise of the federal judicial power. I find nothing in the statute so extraordinarily offensive as to call for such an exercise.
 
 II. ABSTENTION
 
 130
 Abstention is appropriate in this case, basically, because without it the federal courts will be interfering unnecessarily in state judicial processes and judgments. Several more particular reasons for abstention are apparent upon closer examination.
 
 
 131
 A. Younger Abstention.
 
 
 132
 Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, teach that the federal courts ought to abstain from deciding cases which implicate important state interests, when those same issues are the subject of current adjudication in the state courts. Where state criminal proceedings are begun against federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the abstention principles of Younger apply in full force. Hicks v. Miranda, 422 U.S. 332, 349, 95 S.Ct. 2281, 2291-92, 45 L.Ed.2d 223 (1975). Today, seventeen years after Hicks, the policies underlying Younger are fully applicable to noncriminal judicial proceedings when important state interests are involved. Middlesex County Ethics Committee v. Garden State Bar Association, --- U.S. ----, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). In the instant case, state court proceedings were pending before any proceedings of substance on the merits had taken place in federal court.
 
 
 133
 State administrative proceedings preceded the plaintiffs' filing of their complaint herein in federal district court. On April 22, 1977, pursuant to the statutory requirements of the Hawaii Land Reform Act, a public hearing was held on the proposed acquisition of Tract H. On October 20, 1978, the Hawaii Housing Authority made statutorily required findings that acquisition of tract land would effectuate the public purpose underlying the Hawaii Land Reform Act. On October 23, pursuant to statute, the Trustees were directed to negotiate the sale of tract land. On January 18, 1979, the Hawaii Housing Authority declared that negotiations had failed. On January 22, 1979, the Hawaii Housing Authority ordered mandatory negotiations, a move that was later enjoined by the federal district court. Meanwhile, in Midkiff v. Amemiya, Civ. No. 47103 (Hawaii Ct.App. filed June 29, 1978) (complaint of the Trustees of the Bishop Estate asking for declaratory judgment), Judge Lum issued extensive findings of fact and upheld the constitutionality of the Hawaii Land Reform Act.
 
 
 134
 Not until February 28, 1979 did the plaintiffs in the instant case file their complaint in federal court. On November 14, 1979, the district court held a hearing on the initial motion for summary judgment. But by then, three condemnation suits were already pending in the state court. Civ. Nos. 59201, 59202 & 59191. These suits were eventually settled. On April 3, 1980, a subsequent motion for partial summary judgment was heard in the federal district court. However, by then, a fourth condemnation proceeding was pending in the state courts. Civ. No. 60465. On June 10, 1980, the district court issued a final judgment and permanent injunction. Midkiff v. Tom, 483 F.Supp. 62 (D.C.Hawaii 1979). The fourth condemnation proceeding, however, was not settled until September 1981.
 
 
 135
 As of October 18, 1981, the date upon which we heard oral argument in this case, condemnation suits encompassing eighteen of the Trustees' subdivisions were pending in state courts. Thus, condemnation suits were continuously pending in the state courts from before the federal district court heard the initial motion for summary judgment until after we took this appeal under submission. It appears that such suits are still pending now.
 
 
 136
 On November 9, 1981, an interlocutory appeal was taken to the Hawaii Supreme Court on the issue of whether a particular condemnation under the Hawaii Land Reform Act was being done for a public purpose. Hawaii Housing Authority v. George Li Brown, Civ. No. 60945, Supreme Ct. No. 8489. In that case, the Hawaii Supreme Court denied lessees' motion to dismiss landowners' attack on the constitutionality of the Hawaii Land Reform Act. In so doing, the court stated, "it appears that the law does not favor the waiver of a claim that a statute is unconstitutional.... The constitutional issue in this case is of course an issue of public importance."
 
 
 137
 Citing both Younger and Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Seventh Circuit held that a district court properly refrained from interfering with pending state court eminent domain proceedings. Ahrensfeld v. Stephens, 528 F.2d 193 (7th Cir.1975). Citing also Louisiana Power & Light Co. v. City of Thibodaux, supra, the court noted the sensitive nature of federal court intervention in a state's eminent domain system. Also cited with approval was Creel v. City of Atlanta, 399 F.2d 777, 779 (5th Cir.1968), which stated in reference to a federal constitutional challenge proceeding simultaneously with a state court condemnation proceeding:
 
 
 138
 [T]he principal and essential issue is one properly for determination by the state courts. Not only is municipal eminent domain ordinarily a local matter, but it is difficult to imagine a situation where more confusion would arise than would be the case if the parties here were allowed to simultaneously pursue both this action and the state condemnation proceeding.
 
 
 139
 Ahrensfeld, supra, at 198. The Ahrensfeld court reasoned that, since the plaintiffs were able to raise the crux of their federal constitutional claims in the pending state action, federal court intervention was unnecessary.
 
 
 140
 Since important state interests are involved in the implementation of a state's land use policy, Younger abstention is fully applicable here:
 
 
 141
 The importance of the state interest in the pending state judicial proceeding and in the federal case calls Younger abstention into play. So long as the constitutional claims of respondents can be determined in the state proceedings and so long as there is no showing of bad faith harassment or some other extraordinary circumstance that would make abstention inappropriate, the federal courts should abstain.
 
 
 142
 Middlesex County Ethics Committee v. Garden State Bar Ass'n, supra, --- U.S. at ----, 102 S.Ct. at 2523. The constitutional issue in the case before us has been and remains before the Hawaii courts. Clearly the proper route of review for the instant case would have been up the state court ladder and then to the United States Supreme Court.
 
 
 143
 B. Pullman Abstention.
 
 
 144
 Even if there were no ongoing state proceedings requiring abstention under Younger, the principles announced in Pullman, supra, would call for abstention in this case. The Court in Pullman was confronted with an issue which was "more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." 312 U.S. at 498, 61 S.Ct. at 644. The Court observed that adjudication of the constitutional question might be avoided because the case also presented a potentially determinative issue of state law. Under those circumstances, the Court held, the district court ought to abstain from deciding the constitutional issue, as long as it appeared that a definitive ruling on the state issue could be obtained in the state courts "with full protection of the constitutional claim."Pullman abstention is appropriate here, as there may well be an alternative to adjudicating the federal constitutional challenge to the land reform statute. The question concerning the meaning of public use need not be broached if the Hawaii Land Reform Act permits the state to continue to regulate the condemned property in some way to achieve the public goals of alleviating conditions such as inflation and land shortage. Whether the statute permits any continued regulation is a doubtful and possibly determinative issue of state law. By determining the issue on federal grounds, the majority deprives the state of a legitimate opportunity to uphold the land reform program.
 
 
 145
 Furthermore, there has been no definitive ruling as to whether the statute is constitutional under the Hawaii Constitution, which has its own "public use" requirement. A judgment by the Hawaii Supreme Court that the statute was in conflict, either on its face or as applied, with the Hawaii Constitution, would eliminate forever the need for this or any court to decide whether the statute conforms to the requirements of the federal constitution.
 
 
 146
 The majority correctly points out that our court will only reverse the district court's refusal to abstain if such a refusal involves abuse of discretion. In the case at hand the district court did "abuse its discretion," and thus this court should overturn the decision. A leading article on abstention doctrine has persuasively argued:
 
 
 147
 [B]efore abstaining in an authorization case, the federal judge should ascertain whether abstaining will serve any purpose by determining which way he would rule on the state law issue in the absence of abstention. If he would hold the program unauthorized, so that abstention might prevent interference with a state program, he should also ascertain whether the program would suffer irreparable harm from interference. The greater the harm, the more this factor weighs in favor of abstention.
 
 
 148
 Field, Abstention in Constitutional Cases: The Scope of the Pullman Abstention Doctrine, 122 U. of Pa.L.Rev., 1021 at 1126 (1974). Among the "imprecise factors" to be weighed in making the decision are "the degree of unclarity of state law; the extent to which error might harm a state program; and the extent to which the federal constitutional issue is sensitive and calls for swift adjudication." Id.
 
 
 149
 Here, the federal court's decision that the state's program is unconstitutional will irreparably damage the program. Moreover, the federal constitutional issue is complex and not one that demands immediate adjudication. And there is a possibility of a constitutional construction of the statute. See Parts III(C) & (D), infra. Thus, in this case the factors weigh in favor of abstention.
 
 
 150
 In making the decision to abstain in a particular case, a federal court must refer back to our system of federation. Some issues demand federalization. One thinks, for example, of the rights of women and minorities. Given our national history, women and blacks have suffered harms unique to our nation, not to any given state. Thus, it is not only feasible but necessary to protect such rights on a national basis. Rarely is it appropriate for a court to abstain when it has before it a case addressing rights of women or minorities. Los Angeles Unified School Dist. v. United States Dist. Court for the Central Dist. of California, 650 F.2d 1004 (9th Cir.1981) (Ferguson, J., dissenting). Certain kinds of issues are not easy to federalize. Land reform in particular presents a situation in which the problems of each state vary widely. An attempt to federalize takes away from the state an important power and robs its people of any attempt to reach an innovative solution democratically.
 
 III. THE DOCTRINE OF PUBLIC USE
 
 151
 Having wrongly reached the merits in this case, the majority comes to the wrong conclusion about those merits. My analysis of the facts of this case and the applicable law convinces me that the statute under review is constitutional on its face. The majority errs, I think both by mischaracterizing the facts and by misconstruing the applicable law.
 
 A. Standard of Review
 
 152
 If a federal court must consider the merits of a defendant's contention that a taking is not for a public use, the court should apply the proper standard of review. The court must give great deference to the state legislature's determination and to the ruling of the state's highest court. The standard of review is a narrow one. As a consequence:
 
 
 153
 [T]he Court has never actually held a use to be private which the courts of a state, with their intimate knowledge of local conditions and requirements (and with the concurrence of the legislature or even of the people of the state), have declared to be public.
 
 
 154
 Nichols, Eminent Domain Sec. 7.31 [1980]. Of course, this court has been unable to profit from the wisdom of Hawaii's courts, whose judges are intimately knowledgeable about the conditions of that state, because the federal proceeding has aborted the orderly adjudication of issues in the state courts.
 
 
 155
 The majority is cognizant of precedent requiring great judicial deference to a legislative determination that a use is a public use. Berman v. Parker, 348 U.S. 26, 31-32, 75 S.Ct. 98, 101-02, 99 L.Ed. 27; United States ex rel. T.V.A. v. Welch, 327 U.S. 546, 551-52, 66 S.Ct. 715, 717-18, 90 L.Ed. 843 (1946); United States v. Gettysburg Electric Ry. Co., 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896).
 
 
 156
 The majority, however, incorrectly distinguishes those cases on the ground that they involve the review of a congressional rather than a state legislative determination.
 
 
 157
 In the most recent of those cases, Berman, supra, Congress authorized a taking in the District of Columbia. "The power of Congress over the District of Columbia," the Court specifically noted, "includes all the legislative powers which a state may exercise over its affairs." Berman, supra, 348 U.S. at 31, 75 S.Ct. at 102 (emphasis added). In delimiting the scope of judicial review in eminent domain cases, the Berman Court referred to the narrow role that courts play in reviewing state legislation:
 
 
 158
 Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia ... or the States legislating concerning local affairs.... This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one.
 
 
 159
 Berman, supra, 348 U.S. at 32, 75 S.Ct. at 102 (emphasis added). In light of the firm language in Berman, I believe that it is not within our province to usurp the role of Hawaii's legislature.
 
 
 160
 The rule of deference was also set forth in Welch, supra, a case that preceded Berman. A commentator has remarked:
 
 
 161
 [I]t could be argued that the Court in Welch was reserving to itself a greater discretion to review the acts of state legislatures in this area, but it seems clear that the reserve power of the state in this area is greater than the power of the federal government when the federal government is acting within the boundaries of a state (in Welch the federal government condemned land in a state).
 
 
 162
 Hawaii's Land Reform Act, supra, at 37. Finally, Gettysburg Electric Railway, supra, 160 U.S. at 680, 16 S.Ct. at 429, cited with approval the rule "that when the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation." The Court in Gettysburg borrowed that rule from a standard work on municipal corporations--hardly a repository of lore about judicial review of congressional action.
 
 
 163
 The majority is unquestionably correct that it lies with the judiciary to make the ultimate determination of whether a use is public. This is merely a restatement of the principle of judicial review established in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). However, the majority is sadly mistaken if it believes that a restatement of the obvious negates the rule of judicial deference in eminent domain cases.
 
 B. The Fallbrook Approach
 
 164
 The majority's approach to reviewing the taking issue comes closer to the mark when it states, "we must look at each case on an ad hoc basis," and quotes the language in Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 159-60, 17 S.Ct. 56, 63, 41 L.Ed. 369 (1896), "[W]hat is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned." Unfortunately, the majority never analyses this case on the basis of its own particular facts and circumstances. Instead, the majority applies five mechanistic rules, described as "recurring facts and circumstances," derived from other cases. But general propositions do not decide concrete cases.
 
 
 165
 Before further considering the majority's wrong approach, it is instructive to consider the right approach of Fallbrook Irrigation District, supra. In that case, California had passed a law allowing irrigation districts to condemn property. In upholding the law, the court said:
 
 
 166
 [I]n a State like California, which confessedly embraces millions of acres of arid lands, an act of the legislature providing for their irrigation might well be regarded as an act devoting the water to a public use, and therefore as a valid exercise of the legislative power. The people of California and the members of her legislature must in the nature of things be more familiar with the facts and circumstances which surround the subject and with the necessities and the occasion for the irrigation of the lands than can any one be who is a stranger to her soil. This knowledge and familiarity must have their due weight with the state courts which are to pass upon the question of public use in the light of the facts which surround the subject in their own State. For these reasons, while not regarding the matter as concluded by these various declarations and acts and decisions of the people and legislature and courts of California, we yet, in the consideration of the subject, accord to and treat them with very great respect, and we regard the decisions as embodying the deliberate judgment and matured thought of the courts of that State on this question.
 
 
 167
 Id. at 160, 17 S.Ct. at 64. Fallbrook is significant in two respects. First, in its emphasis on facts and circumstances, Fallbrook points to the significance that the shortage of water, an important state resource, has in determining whether a use is public. Second, Fallbrook stresses that the people of a state and members of her legislature have more familiarity than have strangers with the circumstances that justify a taking.
 
 
 168
 The reasoning in Fallbrook was reiterated in Clark v. Nash, 198 U.S. 361, 25 S.Ct. 676, 49 L.Ed. 1085 (1905). Clark upheld a Utah law that gave individual landowners the right to condemn surrounding private land to irrigate their own private land. Shortage of water in Utah also helped to justify the taking. The court again emphasized that peculiar conditions may exist in a particular state, and that great deference is due to the knowledge that a state's citizens possess about local conditions:
 
 
 169
 Where the use is asserted to be public, and the right of the individual to condemn land for the purpose of exercising such use is founded upon or is the result of some peculiar condition of the soil or climate, or other peculiarity of the State, where the right of condemnation is asserted under a state statute, we are always, where it can fairly be done, strongly inclined to hold with the state courts when they uphold a state statute providing for such condemnation. The validity of such statutes may sometimes depend upon many different facts, the existence of which would make a public use, even by an individual, where, in the absence of such facts, the use would clearly be private. Those facts must be general, notorious and acknowledged in the State, and the state courts may be assumed to be exceptionally familiar with them. They are not the subject of judicial investigation as to their existence, but the local courts know and appreciate them.
 
 
 170
 Id. at 367-68, 25 S.Ct. at 678. Similarly, the state courts and legislature of Hawaii must be assumed to be exceptionally familiar with the land shortages in Hawaii and to have an informed understanding of social and economic consequences that result from this peculiar fact. A review of the Hawaii legislature's findings in this regard is illuminating.
 
 C. The Facts of the Case
 
 171
 In Hawaii, a special problem exists that did not exist in eighteenth century America: Land in that state is concentrated under the suzerainty of a few large landowners. The legislature of Hawaii has specifically found:
 
 
 172
 (a) The fee simple ownership of residential lands in the State is still concentrated in the hands of a small number of landowners. The state and federal governments and the largest 72 private landowners own approximately 95 per cent of all land area within the State. On Oahu alone, 22 major private landowners own 72.5 per cent of all land.
 
 
 173
 (b) The small number of landowners have continued to follow the policy of not selling their lands for residential use but of leasing their lands under long-term residential leases. While fee simple ownership still accounted for 68.9 per cent of all owner-occupied housing on Oahu in 1972, leasehold residential development has dominated the housing market since 1967 as it had during the period 1950 to 1967. Between 1950 and 1966, 40 per cent of all owner-occupied housing units developed on Oahu had been on leasehold. Between 1967 and 1972, 46 per cent of such development had been on leaseholds. In 1973, leaseholds constituted 32 per cent of all owner-occupied housing, more than double the percentage in 1960.
 
 
 174
 The foregoing developments have compelled thousands of people in the State to resort to leaseholds to satisfy their housing needs, and this trend is likely to continue in view of the limited availability of land for residential purposes.
 
 
 175
 1975 Haw.Sess.Laws Act 184 Sec. 1, cited in Midkiff v. Tom, 471 F.Supp. 871, 876 n. 21 (D.Hawaii 1979). The Trustees as a group are the single largest private landowner on Oahu. They own 15.1% of all land and 22.1% of all privately owned land on the island. Midkiff v. Amemiya, Civil No. 47103 (Haw.Ct.App.1978). Findings of Fact and Conclusions of Law, June 29, 1978. Much of Hawaii's population is concentrated on the island of Oahu, the island on which Hawaii's most populous city, Honolulu, is located.
 
 
 176
 The legislature has specifically found that the concentration of land, coupled with the large landowners' policy of leasing rather than selling that land, has undesirable economic and social effects. Among the undesirable economic effects are artificially high prices on leasehold units, the discouragement of the development of fee simple units, inequality of bargaining power that strongly favors the lessor in rental negotiations, and a decline in leasehold values after the renegotiation of leases. 1975 Haw.Sess.Laws Act 184 Sec. 1(d).
 
 
 177
 The legislature has also found that residential leaseholds have undesirable social effects. In particular, the pattern of renegotiating leaseholds at ever higher and inflated prices aggravates
 
 
 178
 the already acute need for government-sponsored low and middle income and elderly housing. With the increasing number of elderly in this State, the problem promises to become even more acute in the foreseeable future, and will adversely affect the health and welfare of these people and the general welfare of the people of the State of Hawaii.
 
 
 179
 Id., 184 Sec. 1(e).
 
 
 180
 The Hawaii legislature's findings and declaration of purpose are eloquent testimony to the need for a land reform program that will give persons an opportunity to own their own land. The following are excerpts from Hawaii Rev.Stat. Sec. 516-83 (1976):
 
 
 181
 There is a concentration of land ownership in the State in the hands of a few landowners who have refused to sell the fee simple titles to their lands and who have instead engaged in the practice of leasing their lands under long-term leases;
 
 
 182
 The refusal of such landowners to sell the fee simple titles to their lands and the proliferation of such practice of leasing rather than selling land has resulted in a serious shortage of fee simple residential land and in an artificial inflation of residential land values in the State;
 
 
 183
 Due to such shortage of fee simple residential land and such artificial inflation of residential land values, the people of the State have been deprived of a choice to own or take a lease of the land on which their homes are situated[.] ... Long-term leases ... contain terms and conditions ... that restrict their freedom to fully enjoy such land ...;
 
 
 184
 The economy of the State and the public interest, health, welfare, security, and happiness of the people of the State are adversely affected by such shortage of fee simple residential land and artificial inflation of residential land values and by such deprivation of the people of the State of the choice to own or take a lease of the land on which their homes are situated ...;
 
 
 185
 ... [T]he ability of such people to fully enjoy such land through ownership of such land in fee simple will alleviate these conditions and will promote the economy of the State and public interest, health, welfare, security, and happiness of the people of the State;
 
 
 186
 ... For a growing proportion of Hawaii's population, quite possibly a majority, the high cost of living is denying them such basic necessities as sufficient nutritional intake, safe and healthy housing accommodations, clothing, and adequate preventive and curative health services. A substantive and significant contributing factor to the high and rising cost of living is the high cost of land whether leasehold or fee. Stabilizing the costs of land or, at least, slowing the artificial inflation of land values would curb the rising cost of living in Hawaii ...;
 
 
 187
 The Constitution of the State of Hawaii provides the State the power to provide assistance for persons unable to maintain a standard of living compatible with decency and health. The rising cost of land tied to other cost of living increases is swelling the ranks of those persons unable to maintain a decent and healthful standard of life. If the inflationary trend of land continues unchecked, the resultant inflationary total cost of living could create such a large population of persons deprived of decent and healthful standards of life that the consequent disruptions in lawful social behavior could irreparably rend the social fabric which now protectively covers the life and safety of all Hawaii's people. The threat posed by this possibility is sufficiently real and imminent to warrant State action to redistribute land as a means of curbing continuing inflationary rises in land values.
 
 
 188
 The right to own land is not an irrevocable grant of a special privilege where it operates against the general welfare of the many for the particular benefit of the few....
 
 
 189
 ... Checking inflation, improving the stability of the economy, and forestalling disadvantageous economic disruptions all are productive of general benefit to all members of the Hawaiian society. The sound and wise conservation, preservation, use and management of land cannot be separated from the subject of patterns of land ownership. To accomplish the public purposes of wisely conserving, preserving, using, and managing the land in the State requires changing present patterns of land ownership. Public laws, expenditures, programs, and policies which contribute to the realization of these public purposes serve a public use since they ultimately benefit the entire community....
 
 
 190
 The State's acquisition of residential lands held in fee simple, through the exercise of the power of eminent domain, for the purposes of this chapter is for the public use and purpose of protecting the public safety, health and welfare of all people in Hawaii....
 
 
 191
 ... The State has limited abilities to curb inflation and, perhaps, the only useful means available is the State's power to control land values....
 
 
 192
 The use of the power of eminent domain to condemn the fee simple title to residential land and the payment of just compensation therefor for the purpose of making the fee simple title thereto and the use thereof available for acquisition by people who are lessees under long-term leases of such land and on which such land their homes are situated is for a public use and purpose....
 
 
 193
 Legislation providing to people who are lessees under long-term leases of residential land on which their homes are situated the ability to fully enjoy such land through ownership of such land in fee simple, absolute or otherwise, is for a public purpose.
 
 
 194
 The majority calls none of these findings of fact into question. Indeed, they are scarcely mentioned at all in the majority opinion. They persuade me, however, that the land reform statute which they prompted is well within constitutional limitations. The Hawaii legislature believes that the redistribution of land is necessary to curb inflation, to meet the housing needs of the elderly, and to allow citizens of the state to enjoy fully the land on which their houses are situated. These substantial economic and social goals are legitimate state interests. Given the peculiar facts of land distribution in Hawaii, it cannot be said that the redistribution of land in that state is an arbitrary or capricious means of achieving these interests. I would hold that where property is taken to achieve such substantial benefits for the citizenry, the property is put to a public use.
 
 D. Eastern Sugar Associates
 
 195
 A case very much on point is People of Puerto Rico v. Eastern Sugar Associates, supra. That case upheld the constitutionality of a statute similar to the Hawaii Land Reform Act.
 
 
 196
 Relying directly on Laws of Puerto Rico Annotated, tit. 28, ch. 31 Secs. 241 et seq., a commentator has outlined the purposes of the Land Law of Puerto Rico:
 
 
 197
 The Puerto Rican Legislature passed the Land Law of Puerto Rico which was designed to break up the corporate latifundia (i.e. large landed estates) in order to improve the economic, political, and social health of the Islands. An Authority was created under the provisions of the Law and was given the power to condemn land. The Authority was instructed to carry out the purposes of the Law by (1) breaking up the latifundia and preventing their reappearance, (2) assisting in the creation of a new class of landowners and farmers, (3) providing means for the agregados and slumdwellers to acquire parcels of land on which to build their homes, and (4) taking all actions necessary to achieve the most economic, scientific, and efficient enjoyment of land by all of the People of Puerto Rico. Later the Legislature passed the Vieques Law which directed the Authority to acquire the land of Eastern Sugar Associates on the Island of Vieques.
 
 
 198
 Hawaii's Land Reform Act, supra, at 38 (footnotes omitted). Agregados were heads of families dwelling on land that they did not own.
 
 
 199
 The Authority filed in a Puerto Rican court a petition to condemn the land of Eastern Sugar Associates. After removal of the case on diversity grounds, the district court dismissed the petition for condemnation. The appeal presented the issue: "[W]hether on the pleadings it can be said that the appellees' land is sought to be taken for a public use." 156 F.2d at 320.
 
 
 200
 The court in Eastern Sugar Associates gave great deference to the determinations of the Legislature of Puerto Rico: "We are not, of course, concerned with the wisdom, expediency, or even directly with the necessity of the uses for which the land is proposed to be taken. These are legislative questions with which it is clearly established we have nothing whatever to do." 156 F.2d at 323.
 
 
 201
 While giving deference to the Puerto Rican Legislature, the court recognized:
 
 
 202
 Some public benefit or advantage must accrue from the transfer and mere financial gain to the takers is not enough, since the Supreme Court has intimated that the power of eminent domain cannot be used by the taking authority in aid of "an outside land speculation." ... But the local Legislatures nevertheless have wide scope in deciding what takings are for a public use.
 
 
 203
 Eastern Sugar Associates, supra, at 323.
 
 
 204
 The deference owed to the Puerto Rican Legislature, like that owed to Congress when it acts in the District of Columbia, see Berman v. Parker, supra, is easily explained: Congress conferred powers on the Puerto Rican Government which are "nearly, if not quite, as extensive as the general, residual powers of a state." Eastern Sugar Associates, supra, at 322.
 
 
 205
 The majority, attempting to distinguish Eastern Sugar Associates, makes much of the individual uses described in the Puerto Rican legislation to argue that the land that was taken underwent a change in use. However, the court in Eastern Sugar Associates refused to consider individually the particular uses:
 
 
 206
 Each use plays a part in a comprehensive program of social and economic reform. Thus we see no basis for analyzing each case separately. Instead we think the entire legislation should be regarded "as a single integrated effort," ... to improve conditions on the island, and so viewed we think enactment of the statutes within the power of the Insular Legislature.
 
 
 207
 Id. at 316 (citation omitted and emphasis added).
 
 
 208
 The court in Eastern Sugar Associates rejected the argument "that due process is denied because the purpose for taking the appellees' land is only to sell or lease it to others for them to use personally instead of for use by the general public." Eastern Sugar Associates, supra, at 316. The court found that this argument had already been rejected several times in Supreme Court cases: Rindge Co. v. Los Angeles, 262 U.S. 700, 43 S.Ct. 689, 67 L.Ed. 1186 (1923); Vernon Cotton Co. v. Alabama Power Co., 240 U.S. 30, 36 S.Ct. 234, 60 L.Ed. 507 (1916); Strickley v. Highland Boy Mining Co., 200 U.S. 527, 26 S.Ct. 301, 50 L.Ed. 581 (1906); Clark v. Nash, supra; Fallbrook Irrigation District, supra.
 
 E. The Majority's Incorrect Approach
 
 209
 Even though the taking clause speaks of "public use," language that is broad in scope and not encompassed by a check list, and even though the precedents require an ad hoc approach, the majority nevertheless propounds five tests, drawn, it says, from the cases, by which to determine whether the use here is public. I turn now to a brief examination of the majority's check list:
 
 
 210
 1. Historically accepted public use. This test is helpful only in those simple cases that represent no expansion of past public uses. But as the majority itself recognizes, the law of eminent domain had very humble beginnings in mill acts and in the building of roads. The history of public use has been a history of the expansion of the concept to accommodate new circumstances. Eminent domain has been used to condemn slum areas, Berman v. Parker, supra; to distribute land to squatters, People of Puerto Rico v. Eastern Sugar Associates, supra; and to condemn a football league franchise, City of Oakland v. Oakland Raiders, Ltd., supra.
 
 
 211
 2. Change in the use of land. The majority acknowledges that the Hawaii Land Reform Act may change the use of land; after condemnation, the land would be used exclusively for residential rather than investment purposes, and persons who own land outright are likely to treat it differently than tenants would. Maj. op., ante, at 796-797. The majority then offers the non-sequitur that these "alleged changes in use ... are simply different forms of private use."
 
 
 212
 This argument by label, namely, that the change in use is merely a change in private use, conceals a serious confusion. The word "use" is susceptible to two entirely different meanings, namely, "employment" and "advantage."
 
 
 213
 There may be a change in private use, in the sense of a change in the private employment of land, such that a public advantage is conferred sufficient for the courts to hold that the land is now put to public use: the new private use in which the land is employed yields a public advantage. This occurred, for example, in Clark v. Nash, supra, a case in which an individual condemned private land to irrigate his own land. To dismiss an actual change in use as a mere change in "private use" is to ignore the possibility that a public advantage is thereby gained. The issue is whether the public advantage gained by a change in the private employment of land yields a public use.
 
 
 214
 3. Change in possession. The majority notes that a change in possession commonly occurs after a taking, then promptly cites two cases that undermine the rule.
 
 
 215
 In the instant case, continuous possession by the housing tract leaseholders is significant only because it favors their equities by diminishing possible hardships to the property owner. Whatever hardships might specifically burden a property owner who loses possession of house and land cannot be present in this case.
 
 
 216
 4. Taking by the government. The ultimate beneficiary of a valid taking is not the government: it is always the public. A taking by the government merely provides some insurance that it will be the public who benefits. To be sure, there is a danger, to which the courts must be alert, when the power of eminent domain is delegated to a private corporation. United States v. Gettysburg Electric Ry. Co., supra, 160 U.S. at 680, 16 S.Ct. at 429.
 
 
 217
 In the instant case, however, the state has not delegated authority to a private corporation. Indeed, insurance that the public will benefit is provided by the Hawaii Land Reform Act, which requires the Hawaii Housing Authority, a governmental body, to find that the purposes of the Act will be effectuated by a taking, and which vests discretion in the Authority, not in private individuals. Haw.Rev.Stat. Sec. 516-22.
 
 
 218
 5. De minimis taking. The majority notes that courts have upheld the condemnation of land where the taking is de minimis and for the purpose of facilitating the development of nearby land. The majority cites two cases. Need one add that courts have upheld numerous takings that were not de minimis?
 
 
 219
 The sovereign powers of a state exist to promote the health, welfare, security and happiness of the people of the state--in sum, to promote the public interest. Whether the Hawaii Land Reform Act has been wisely chosen as a means for achieving the legislature's objectives is not for us to say.
 
 
 220
 Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.
 
 
 221
 Chicago, Burlington & Quincy R.R. Co. v. McGuire, 219 U.S. 549, 564, 31 S.Ct. 259, 261, 55 L.Ed. 328 (1911).
 
 CONCLUSION
 
 222
 I believe that the land reform program enacted by the Hawaii Legislature does not result in an unlawful taking of property. I also believe, however, that instead of reaching the merits of this question, the majority should have abstained in favor of ongoing state judicial processes. On both grounds I therefore register my dissent.
 
 
 
 [1]
 Federal district court jurisdiction of the case sub judice is based upon 28 U.S.C. Secs. 1331 (federal question), 1343 (civil rights) & 2201 (declaratory relief) and 42 U.S.C. Sec. 1983 (civil action for deprivation of rights). The issue of whether the district court should abstain from the exercise of its jurisdiction was raised during the proceedings below. The district court proceeded to the merits and thus implicitly exercised its discretion to decline abstention. See Midkiff v. Tom, 483 F.Supp. 62 (D.Haw.1979)
 The general rule is that a federal court must decide the cases properly before it; abstention from the exercise of jurisdiction is the exception to the rule. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); Shamrock Dev. Co. v. City of Concord, 656 F.2d 1380, 1385 (9th Cir.1981). "[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy." Zablocki v. Redhail, 434 U.S. 374, 379-80 n. 5, 98 S.Ct. 673, 677-678 n. 5, 54 L.Ed.2d 618 (1978). This court will reverse the district court on the issue of abstention only where there has been an abuse of discretion. Shamrock Dev. Co., 656 F.2d at 1385.
 There are several bases upon which a federal court may abstain from exercising its jurisdiction. See International Bhd. of Elec. Workers, Local Union No. 1245 v. Public Serv. Comm'n, 614 F.2d 206, 211-12 (9th Cir.1980) [International Bhd ]. A federal court may decide to abstain, for example, where a federal constitutional issue could be "mooted or presented in a different posture by a state court determination of pertinent state law." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959) (citing inter alia Railroad Comm'n v. Pullman Co., 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941)). This court has held that abstention based upon this doctrine (Pullman abstention) is required if three tests are met:
 (1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."
 (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
 (3) The possibility determinative issue of state law is doubtful.
 Canton v. Spokane School Dist. # 81, 498 F.2d 840, 845 (9th Cir.1974) (citing Pullman, 312 U.S. at 498-99, 61 S.Ct. at 644-645) (footnote omitted). A state's system of eminent domain "is intimately involved with sovereign prerogative," Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28 (1959) (upholding district court's exercise of discretion resulting in abstention), however, this alone is insufficient to require abstention. Frank Mashuda Co., 360 U.S. at 191-92, 79 S.Ct. at 1064-1065; see Zablocki, 434 U.S. at 379-80 n. 5, 98 S.Ct. at 677-678 n. 5 (1978); Pue v. Sillas, 632 F.2d 74, 78 (9th Cir.1980). It is especially crucial that there be "an uncertain issue of state law." Id. at 78. The Hawaii Land Reform Act is perfectly clear as to the key issue of whether the condemnation system set forth in Hawaii Rev.Stat. ch. 516 is for a public use. The statute unambiguously states: "The use of the power to eminent domain [under the Hawaii Land Reform Act] ... is for a public use and purpose." Hawaii Rev.Stat. Sec. 516-83(a)(12). Moreover, there is no fair construction of this provision that would moot the federal issue of whether the condemnation is for a public use. "Hence, the naked question, uncomplicated by an unresolved state law, is whether the Act on its face is unconstitutional." Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971). Abstention by the district court thus would have been inappropriate.
 Federal courts may also decline to exercise their jurisdiction where the dispute involves "an essentially local issue arising out of a complicated state regulatory scheme ...." International Bhd., 614 F.2d at 211. See Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The Ninth Circuit has limited abstention under this principle (Burford abstention) to cases where: (1) the state has concentrated suits involving the local issue in a particular court; and (2) the federal issues are not easily separable from state law issues with which the state courts may have special competence. See International Bhd., 614 F.2d at 211. Hawaii has not concentrated challenges to its condemnation system in any court. The federal issue of whether the takings provided for by the state legislature is for a public use is easily separable from any state law issues especially since the statute is clear. Burford abstention is thus inapplicable.
 Finally, abstention by a federal district court is appropriate under the principles of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Younger and its progeny counsel federal court abstention when there is a pending or ongoing state proceeding, Moore v. Sims, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979); L.H. v. Jamieson, 643 F.2d 1351, 1352 (9th Cir.1981), in which the federal claims could be competently adjudicated. See Moore, 442 U.S. at 425, 99 S.Ct. at 2378. The Supreme Court recently reiterated that abstention under Younger principle is limited to federal cases which "seek to enjoin state judicial proceedings...." Fair Assessment in Real Estate Ass'n Inc. v. McNary, 454 U.S. 100, 102 S.Ct. 177, 185, 70 L.Ed.2d 271 (1981). See Zablocki, 434 U.S. at 379-80 n. 5, 98 S.Ct. at 677-678 n. 5. Plaintiffs in this action have not sought to enjoin any state judicial proceedings. We are informed by counsel on both sides of the abstention issue that, as of the time this action was filed, no condemnation actions had been filed in the state courts. This fact is undisputed. Moreover, even though such suits may now be pending in the state courts, the "principles of comity and federalism do not require that a federal court abandon jurisdiction it has properly acquired simply because a similar suit is later filed in a state court." Town of Lockport, N.Y. v. Citizens for Community Action at the Local Level, Inc., 430 U.S. 259, 264 n. 8, 97 S.Ct. 1047, 1051 n. 8, 51 L.Ed.2d 313 (1977) (emphasis added). The district court acted correctly in declining to abstain from the exercise of its jurisdiction.
 
 
 [2]
 United States Constitutional Sequicentennial Comm'n, History of the Formation of the Union Under the Constitution 122 (1941)
 
 
 [3]
 Madison also articulated this concept earlier during the constitutional convention: "The lesson we are to draw ... is that where majority are united by a common sentiment and have an opportunity, the rights of the minor party become insecure." 1 The Records of the Federal Convention of 1787, 136 (M. Farrend ed. 1911)
 
 
 [4]
 Hawaii Rev.Stat. Sec. 516-83(a)(12) states:
 The use of the power to eminent domain to condemn the fee simple title to residential land and the payment of just compensation therefor for the purpose of making the fee simple title thereto and the use thereof available for acquisition by people who are lessees under long-term leases of such land and on which such land their homes are situated is for a public use and purpose.
 (emphasis added).
 
 
 [1]
 Section 20 provides:
 Private property shall not be taken or damaged for public use without just compensation.
 
 
 [2]
 The dissent implies, but does not endeavor to support, the view that somehow the courts of Hawaii might chance upon a construction of the Land Reform Act under circumstances not relying upon familiar concepts of "public use." Since this is only sheer speculation, it need not detain our thoughts
 
 
 [3]
 The principal case upon which appellees rely, Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), is generally classified as within Burford abstention. See Colorado River, 424 U.S. at 814, 96 S.Ct. at 1244-1245. In Thibodaux the Court upheld a lower court decision to abstain in an eminent domain action removed to federal court, referring to the "special nature" of eminent domain as "intimately involved with sovereign prerogative." 360 U.S. at 28, 79 S.Ct. at 1073
 Yet Thibodaux should not be read as an endorsement of abstention in all proceedings involving eminent domain. On the day it decided Thibodaux, the Court held that abstention was not appropriate in another eminent domain case, County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). The Court specifically stated that merely because "a case concerns a state's power of eminent domain no more justifies abstention than the fact that it involves any other issue related to sovereignty." 360 U.S. at 191-92, 79 S.Ct. at 1064.
 Although the two opinions are not easily reconciled, see C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure Sec. 4241 at 441 (1978), the Supreme Court has subsequently indicated that the principal significance of Thibodaux is its holding that a district court may find it necessary to abstain where the case involves "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." Colorado River, 424 U.S. at 814, 96 S.Ct. at 1244. In particular, the state law issue in Thibodaux was whether a city could exercise the power of eminent domain under Louisiana law--an issue, as Colorado River suggests, which transcended the importance of the case itself. Here there is no such independent state law issue.
 
 
 [4]
 The project involved was the taking for the construction of an Athletic and Convention Center. The federal plaintiffs challenged public purpose and also that such a taking was improper under the applicable Illinois Eminent Domain Act. The court said: "Since 'the state court's interpretation of the [statute] may obviate any need to consider [its] validity under the Federal Constitution, the federal court should hold its hand, lest it render a constitutional decision unnecessarily.' " 528 F.2d at 200 (citing City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 641, 79 S.Ct. 455, 457, 3 L.Ed.2d 562 (1959), and Martin v. Creasy, 360 U.S. 219, 224, 79 S.Ct. 1034, 1037, 3 L.Ed.2d 1186 (1959). (Citations omitted.)
 
 
 [5]
 Section 516-22 provides:
 Designation of leased fee interest in all or part of development tract for acquisition. The authority may designate all or a portion of a development tract for acquisition and acquire leased fee interests in residential houselots in such development tract, through the exercise of the power of eminent domain or by purchase under the threat of eminent domain after twenty-five or more lessees or the lessees of more than fifty percent of the residential lease lots within the development tract, whichever number is the lesser, have applied to the authority to purchase the leased fee interest in their residential leasehold lots pursuant to section 516-33 and if, after due notice and public hearing, * * * the authority finds that the acquisition of the leased fee interest in residential houselots in all or part of the tract through exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof, as provided in this part will effectuate the public purposes of this chapter.
 Younger abstention was, as contended by the dissent, not triggered by the Housing Authority hearings provided by the statute since the Supreme Court has indicated that abstention is limited to judicial and not administrative proceedings. See Fair Assessment in Real Estate Association v. McNary, 454 U.S. 100, 112-13, 102 S.Ct. 177, 184, 70 L.Ed.2d 271 (1981). Cf. Patsy v. Board of Regents, --- U.S. ----, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (exhaustion of state administrative remedies not required under section 1983).
 In Middlesex, 102 S.Ct. at 2522, the Court concluded that the district court properly abstained to prevent interference with disciplinary proceedings of a local District Ethics Committee appointed by the New Jersey Supreme Court. However, there the Court specifically found that under New Jersey law the proceedings were "judicial in nature." In particular, the Court noted that the local committees are considered the arm of the New Jersey Supreme Court and that filing a complaint with the committee "is in effect a filing with the Supreme Court."
 In the present case, the public hearings before the Hawaii Housing Authority bear none of the attributes of a judicial proceeding such as that found in Middlesex.
 
 
 [6]
 Following the district court's ruling, the Hawaii Legislature amended Section 516 to remove the mandatory arbitration provision and to amend the valuation provisions
 
 
 [7]
 In fact, no party addressed the abstention issue until the court raised the subject at oral argument
 
 
 [8]
 "No freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed, nor will we go upon him, nor send against him, save by lawful judgment of his peers, or by the law of the land. We will not sell, nor deny, nor delay to any man either justice or right." Magna Carta (1225), Cap. XXIX, Pound and Plucknett, Readings on the History and System of the Common Law, 3d ed., page 180
 
 
 [9]
 While the legislature finds a shortage of fee simple residential property, it is significant that there is a surplus of condominiums on the islands. See Midkiff v. Amemiya (Findings of Fact), supra
 
 
 [10]
 "For a man's property is not at all secure, though there be good and equitable laws to set the bounds of it between him and his fellow subjects, if he who commands those subjects have the power to take from any private man what part he pleases of his property, and use and dispose of it as he thinks good." J. Locke, The Second Treatise of Government (An Essay Concerning the True Original, Extent and End of Civil Government 138 (J. Gough 3d ed. (1966) at 71))